[No. D054685. Fourth Dist., Div. One. Apr. 27, 2010.]

PLAZA HOME MORTGAGE, INC., Plaintiff and Appellant, v.
NORTH AMERICAN TITLE COMPANY, INC., Defendant and Respondent.

**COUNSEL**

Lynde Selden II for Plaintiff and Appellant.

Severson & Werson, Sunny S. Huo and Joshua E. Whitehair for California Mortgage Bankers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Garrett & Tully, Robert Garrett, Ryan C. Squire and Scott B. Mahler for Defendant and Respondent.

**OPINION**

**BENKE, Acting P. J.**—Plaza Home Mortgage, Inc. (Plaza), appeals the motion of judgment granted by the trial court after it found (1) North American Title Company, Inc. (North American), did not breach the closing instructions contract between Plaza, a wholesale lender, and North American, the settlement agent; and (2) even if North American did breach that contract, there was no showing by Plaza that North American proximately caused Plaza's damages.

Plaza sued North American after North American distributed $53,853 to the attorney in fact of the buyer of real property—a payment Plaza refers to as a "kickback"—that was neither authorized by the closing instructions nor disclosed by North American before it made the payment. North American made the $53,853 payment after escrow closed, based on a last-minute escrow instruction it received from the owner of the property at or near the time of the closing of escrow.

As we explain, we conclude the court erred both when it found there was no breach of the closing instructions contract with Plaza because escrow had closed and when it failed to consider whether North American breached the closing instructions contract when it disbursed the $53,853 payment and closed the two loans to the buyer/borrower without first notifying Plaza of the last-minute escrow instruction.

We thus reverse the judgment and remand with instructions for the trier of fact to determine—consistent with this opinion—whether North American breached the closing instructions contract and if so, whether the breach proximately caused damage to Plaza.

## FACTS AND PROCEDURAL BACKGROUND

The relevant facts are not in dispute. Plaza is a wholesale residential mortgage lender. In March 2007, Plaza loaned $1.1 million to Oliver Aleta

for the purchase of a residence located in Northridge, California, and owned by Monette Santillian (subject property). Aleta's part of the transaction was handled largely by Edward Peregrino, who acted as Aleta's attorney in fact. Plaza lent Aleta 100 percent of the purchase price, and funded the transaction by way of two loans secured by an $880,000 first deed of trust and a $220,000 second deed of trust. The first lien was a "five-year hybrid option adjustable rate mortgage" that gave Aleta the option to make an interest-only, or a minimum, monthly payment.

North American acted as the escrow holder and settlement agent, and Investors Title Company (Investors) served as the subescrower in the transaction. In connection with the loans, North American prepared and delivered to Plaza a good faith estimate or estimated HUD-1[1] that set forth the terms, the estimated costs and disbursements at closing, of the loans.

On March 1, 2007, Plaza disbursed the loan proceeds to Investors, which paid off (in what the parties call the "sub-escrow") the then existing liens on the subject property. Investors sent the balance of the loan proceeds to North American for distribution in accordance with the closing instructions contract between Plaza and North American. As discussed *post*, among other things, North American represented that by signing the addendum to the closing instructions, the settlement "agent certifies that there are *no additional payoffs or fees that were not disclosed to the lender either verbally or on an Estimated HUD-1.*" (Italics added.)

The subject property was transferred from Santillian to Aleta by grant deed, which was recorded at 8:00 a.m. on March 2, 2007, and escrow was closed. At some point in time before the balance of the loan proceeds was disbursed by North American, Santillian sent a written instruction to North American requesting that it pay $53,853 to Peregrino, Aleta's attorney in fact.[2] North American complied and made the distribution to Peregrino on March 5, 2007. Because the $53,853 payment was not included on the estimated HUD-1, and because North American distributed the money to Peregrino without first disclosing it to Plaza, Plaza did not have actual or constructive knowledge of the payment until March 8, 2007, when it received the final HUD-1, or final settlement statement,[3] prepared by North American.

---

[1] On loans for one- to four-family residential property a good faith estimate of costs or estimated HUD-1 and a final HUD-1 or final settlement statement are required by the United States Department of Housing and Urban Development (HUD) under the terms of the Real Estate Settlement Procedures Act (RESPA), title 24 Code of Federal Regulations, volume 5, chapter XX, part 3500 et seq.

[2] There is a dearth of evidence in the record regarding exactly *when* North American received the written instruction from Santillian regarding the $53,853 payment.

[3] See footnote 1, *ante*, at page 133.

The final HUD-1 disclosed for the first time the $53,853 payment to Peregrino under the rubric "Additional Settlement Charges."

Peregrino made the first two monthly mortgage payments on behalf of Aleta, who never moved into the subject property and defaulted on the third mortgage payment. As discussed *post*, Plaza was unable to sell the Aleta loans on the secondary market, as it had anticipated, and mitigated its losses by settling with Aleta, taking back the subject property and selling it with the help of a broker. Because of the precipitous decline in the real estate market, Plaza sold the subject property in late 2007 for $760,000.

Plaza sued North American for breach of contract, negligence and equitable indemnity.[4] Plaza alleged that North American was contractually obligated to advise Plaza of "all . . . expected closing costs and disbursements prior to closing so that [Plaza] would be advised about the destination of its loan monies." Plaza further alleged North American breached that obligation when, without the knowledge of Plaza, North American disbursed $53,853 to Peregrino despite the fact that payment was not included in the estimated HUD-1. Plaza alleged that had it known of the request for such payment, and/or the fact that Peregrino had signed virtually all of the loan and closing documents on behalf of Aleta, it would have investigated this "irregular transaction" further and potentially not funded the loans at all.[5]

The case proceeded to a bench trial. After Plaza rested, North American moved for motion for judgment under Code of Civil Procedure section 631.8. The trial court granted the motion, reasoning: "The Court agrees with defense counsel that we have an action by the escrow company [North American] that occurred after the closing, not inconsistent with section 5 of the closing instructions, because funding has concluded and the instructions there were only for duties prior to the funding. [¶] And, further, I also find that there is no causation in that we clearly can see that there's no causation as it relate[s] to Greenwich [(a potential purchaser of the loans)]. And, second, it is clear to this Court that there were several reasons that this loan would have been rejected even by Bayview Funding [(another potential purchaser)], and therefore no causation as to Bayview Funding either. Accordingly, the motion is granted."

---

[4] At oral argument, Plaza confirmed it has abandoned its negligence and equitable indemnity claims against North American, and presently is pursing only its breach of contract action.

[5] North American notes that at a minimum Plaza had constructive knowledge that Peregrino was acting as Aleta's attorney in fact in this "irregular transaction" because Peregrino executed virtually all of the loan and closing documents on Aleta's behalf.

## DISCUSSION

### A. Standards of Review

■ " 'The purpose of Code of Civil Procedure section 631.8 is "to enable the court, when it finds at the completion of plaintiff's case that the evidence does not justify requiring the defense to produce evidence, to weigh evidence and make findings of fact." [Citation.] Under the statute, a court acting as trier of fact may enter judgment in favor of the defendant if the court concludes that the plaintiff failed to sustain its burden of proof. [Citation.] In making the ruling, the trial court assesses witness credibility and resolves conflicts in the evidence. [Citations.]' " (*Kinney v. Overton* (2007) 153 Cal.App.4th 482, 487 [63 Cal.Rptr.3d 136].)

" 'The standard of review of a judgment and its underlying findings entered pursuant to [Code of Civil Procedure] section 631.8 is the same as a judgment granted after a trial in which evidence was produced by both sides. In other words, the findings supporting such a judgment "are entitled to the same respect on appeal as are any other findings of a trial court, and are not erroneous if supported by substantial evidence." ' " (*Allegretti & Co. v. County of Imperial* (2006) 138 Cal.App.4th 1261, 1269 [42 Cal.Rptr.3d 122], quoting *San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 528 [86 Cal.Rptr.2d 473].) " '[W]hen the decisive facts are undisputed, [however,] the reviewing court is confronted with a question of law and is not bound by the findings of the trial court. [Citation.] In other words, the appellate court is not bound by a trial court's interpretation of the law based on undisputed facts, but rather is free to draw its own conclusion of law.' " (*Allegretti*, at p. 1269, quoting *San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc., supra*, 73 Cal.App.4th at p. 528.)

Notwithstanding the standard of review by which we are bound, we conclude the trial court failed to apply the appropriate legal analysis.

### B. Principles of Contract Interpretation

■ We begin by noting Plaza's claims of error by the trial court require us to interpret the written closing instructions contract between Plaza and North American. "It is a judicial function to interpret a contract or written document unless the interpretation turns upon the credibility of extrinsic evidence." (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 71 [56 Cal.Rptr.2d 723].)

"The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. (Civ. Code, § 1636; *Bank of the*

*West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 [135 Cal.Rptr.2d 505], citing Civ. Code, § 1639.)

Moreover, the "words of a contract are to be understood in their ordinary and popular sense . . . ." (Civ. Code, § 1644; see also *Lloyd's Underwriters v. Craig & Rush, Inc.* (1994) 26 Cal.App.4th 1194, 1197–1198 [32 Cal.Rptr.2d 144] ["We interpret the intent and scope of the agreement by focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made."].) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." (Civ. Code, § 1647.)

## C. *The Closing Instructions*

Unlike escrow instructions, which constitute an agreement between the escrow company, on the one hand, and the buyer and seller, on the other hand, the closing instructions at issue here set forth the terms and conditions of closing the loans funded by Plaza, and set out the duties and responsibilities of the settling agent, North American, in connection with that closing. The closing instructions required North American to ensure the loan documents were signed by the borrower and returned to Plaza before disbursement of the loan proceeds, and to disclose the fees and costs of the loans (e.g., broker, processing and other administrative fees), any payments outside of, or credits in connection with, the loans, and the details of the loans themselves (e.g., the name of the borrower, the address of the subject property, the loan amounts and interest rates, and the date of the first mortgage payment).

Aleta, through his attorney in fact, signed the closing instructions acknowledging the fees charged for the loans were acceptable. North American's representative also signed, but did not date, the closing instructions. In so doing, the representative acknowledged: "I have read, understand, and have complied with all requirements listed on these instructions, [and] *any Addendums hereto* . . . ." (Italics added.)

The addendum, which also was signed, but not dated, by a North American representative, provided:

"Attention Settlement Agents

"Plaza Home Mortgage will <u>not</u> [disburse] funds to cover borrower fees that either do <u>not</u> appear on the Estimated HUD-1 or fees that were <u>not</u> verified by a Closer employed by Plaza Home Mortgage.

"Lenders are required to accurately disclose fees to our borrowers. Any increase or decrease greater than $35 for borrower paid fees will constitute the redraw and resigning of the TIL [(truth-in-lending)] Itemization, Closing Instructions, and Right to Cancel (if applicable) documents.

"Please thoroughly review the fees listed on our Truth-in-Lending Itemization and verify that these fees match those on the final HUD-1 Settlement Statement. The settlement agent <u>cannot</u> change fee amounts after the final documents have been signed by the borrower. Note: An additional redraw fee of $150 may be charged to the broker and/or settlement agent.

"The settlement agent is <u>required</u> to sign & date below.

"Acknowledged and agreed:

"BY: /s/_____

 Settlement Agent's Signature Date

"By signing, the settlement agent certifies that there are *no additional payoffs or fees that were not disclosed to the lender either verbally or on an Estimated HUD-1*." (Italics added.)

The second page of the addendum included 10 additional conditions that had to be satisfied before funding, including: "5) PRIOR TO FUNDING— MAX SELLER CONCESSIONS 3% NOT TO EXCEED ACTUAL AMOUNT OF COSTS, NO CASH CREDITS ALLOWED TO BORROWER ON HUD-1."

 D. *Breach of Contract Action*

We conclude under the plain language of the addendum that before North American closed the loans, it was contractually bound to disclose to Plaza any "additional payoffs" that were not disclosed either in the estimated

HUD-1 or verbally by North American. (See *Money Store Investment Corp. v. Southern Cal. Bank* (2002) 98 Cal.App.4th 722, 728 [120 Cal.Rptr.2d 58] (*Money Store*) [concluding the closing instructions from the lender to the escrow bank, concerning the distribution of funds for the sale of a chiropractic practice that was the subject of a separate escrow between the buyer and seller, constituted a valid and enforceable contract between the lender and the bank].)

North American argues that it had no duty to disclose the $53,853 payment to Peregrino because escrow closed at the latest when the loans funded and the grant deeds recorded at 8:00 a.m. on March 2, 2007, *before* North American received Santillian's written instruction to pay Peregrino $53,853.[6] According to North American, when it received the instruction to pay Peregrino, Santillian held "equitable title to the money" and could distribute the money as she saw fit. (See, e.g., *Andover Land Co. v. Hoffman* (1968) 264 Cal.App.2d 87, 90 [70 Cal.Rptr. 38] ["When all conditions of the [escrow] instructions have been complied with an equitable title to the money vests in the seller and an equitable title to the property vests in the buyer."].)

■ While this principle may be correct as far as it applies to a buyer and seller of real property regarding who "owns" escrow funds or real property at a particular point in time, we conclude it does not apply here. Instead, we are concerned in the instant case with the duties and obligations of North American as set forth in the closing instructions contract. One such duty was the obligation of North American to disclose to Plaza any "additional payoffs or fees" that were not included in the estimated HUD-1, or otherwise disclosed by North American. We conclude this duty to disclose continued until the loans closed, and not, as North American argues and the trial court concluded, when escrow closed.

Indeed, the addendum to the closing instructions contemplated that as the settling agent, the duties and responsibilities of North American continued *after* escrow closed. For example, the record shows North American was obligated to prepare, and in fact prepared, the final HUD-1 *after* escrow closed. The final HUD-1 provided the actual settlement costs of the loans, and disclosed for the first time the $53,853 disbursement to Peregrino on March 5, 2007. In addition, the addendum to the closing instructions required North American to "thoroughly review" the borrower fees listed in the truth-in-lending itemization and verify that those fees matched the fees in the final HUD-1.

---

[6] Although not determinative in this appeal, as we noted *ante* there is no competent evidence in the record regarding *when* North American received Santillian's supplemental escrow instruction authorizing the $53,853 payment to Peregrino.

Thus, it is clear from the closing instructions themselves that the parties contemplated that the duties and obligations of North American—including the duty to disburse funds in accordance with the estimated HUD-1, absent disclosure otherwise—continued until the loans, as opposed to escrow, closed. That escrow closed on March 2, 2007, is irrelevant to the issue of whether North American breached the closing instructions contract when it disbursed on March 5, 2007, the $53,853 payment to the buyer's attorney in fact. In light of the fact the final HUD-1 included the $53,853 payment disbursed on March 5, 2007, we conclude North American's duties as the settling agent, as opposed to its duties as the escrow agent, continued at least through its preparation of the final HUD-1.

The instant case is similar to the facts in *Money Store, supra,* 98 Cal.App.4th 722, which provides guidance on our issue. There, the lender sued the escrow bank for breach of contract and negligence, among other causes of action, after the bank distributed loan proceeds that were contrary to the lender's closing instructions. (*Id.* at p. 727.) On the same day the lender funded the loan for the purchase by the buyer of a chiropractic practice, the buyer and seller submitted an addendum to the escrow instructions, agreeing that a portion of the loan proceeds should be paid to a third party and the *buyer.* The bank then closed escrow and distributed the proceeds in accordance with the escrow addendum, which was contrary to the closing instructions from the lender. (*Ibid.*) The lender argued that had it known of the change in terms of the escrow, it would not have closed the loan. (*Ibid.*)

In reversing the grant of summary judgment for the bank, the court ruled the closing instructions constituted a valid and enforceable contract between the lender and the bank. (*Money Store, supra,* 98 Cal.App.4th at p. 728.) The court remanded the case on the issue of whether the bank breached the closing instructions in light of the facts of that case. In so doing, the court in *Money Store* rejected the argument of the bank that its duty was to distribute the money in accordance with the parties' escrow instructions, including the addendum, and noted the bank may have "confuse[d] its duties under [the parties' escrow] instructions [with] its duties under the [lender's] instructions." (*Id.* at p. 729.) For remand, the court further noted the bank "arguably breached its agreement" with the lender when it paid the funds as directed by the parties in the escrow instructions, and not as directed by the lender in the closing instructions. (*Ibid.*)

Here, like the lender and bank in *Money Store,* Plaza, as the lender, and North American, as the settling agent, had a direct contractual relationship arising from the closing instructions. Plaza's closing instructions provided for distribution of the loan proceeds based on information it had received from

North American in the estimated HUD-1 prepared by North American. North American agreed in the addendum to the closing instructions that the proceeds of the loan would be distributed as set forth in the estimated HUD-1, inasmuch as North American certified that there were no "additional payoffs or fees" that were not included in the estimated HUD-1 or verbally disclosed to Plaza.[7]

If we accepted North American's argument at trial and in this appeal, that after escrow closed—but before the balance of the loan proceeds was distributed in accordance with the closing instructions (that are based on the estimated HUD-1 approved by the lender)—the seller could authorize distributions of money that conflicted with the closing instructions, we would be creating a void or "legal holiday," so to speak, between escrow and settlement. That void, in turn, would actually encourage potentially illegal and unlawful conduct, such as the "kickbacks" in *Money Store* or here, which Plaza claims was a "red flag" that the subject property was overvalued and the appraisal inflated.[8]

Our decision is narrow. We conclude only that the trial court erred when it determined North American did not breach the closing instructions contract with Plaza merely because escrow had closed. Given the narrow nature of our decision, we do not decide in this appeal whether North American breached that contract with Plaza or whether any such breach was the proximate cause of Plaza's damages.[9]

---

[7] We did not consider in this appeal whether North American may have breached other provisions of the closing instructions by distributing $53,853 to Peregrino, including "condition 5" in the addendum that set a 3 percent ceiling on "seller concessions."

[8] This court on January 11, 2010, granted the application of the California Mortgage Bankers Association (CMBA), a nonprofit trade association, for leave to file a brief of amicus curiae on behalf of Plaza. In its brief, CMBA noted that Plaza was the victim of mortgage fraud, specifically the so-called "property flipping" or "seller-assistance" scam, which CMBA noted was one of the most common types of mortgage fraud in a depressed or declining housing market. CMBA also noted this type of "scam" can take many forms, "but essentially involves a seller recruiting a straw buyer to obtain a mortgage to purchase the home at an inflated value. The seller is paid from the sale of the home and the buyer receives a 'cash back' or 'servicing fee' directly from the seller or through a third-party. The buyer holds the property for a short time but fails to make payments. When the mortgage defaults, the lender forecloses but often is unable to sell the overvalued house." We also have considered in this appeal North American's response to amicus curiae CMBA's brief.

[9] North American requested judicial notice of requests for admissions it propounded on Plaza and Plaza's responses thereto (exhibits A and B, attached to the request), as well as the two deeds of trust securing Plaza's loans to Aleta (exhibits C and D). Plaza opposed the request for judicial notice only as to the trust deeds, arguing they were not relevant evidence. We grant North American's request for judicial notice as to all four exhibits, and have considered that evidence in this appeal.

## DISPOSITION

The judgment is reversed. On remand, the trier of fact shall determine—consistent with this opinion—whether North American breached the closing instructions contract and if so, whether that breach proximately caused Plaza's damages. Plaza is awarded its costs on appeal.

Haller, J., and O'Rourke, J., concurred.

A petition for a rehearing was denied May 25, 2010.