Filed 3/17/14  Franzen v. Brookfield Southland Builders CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DONALD E. FRANZEN et al., | |
| Plaintiffs and Appellants, | G049210 |
| v. | (Super. Ct. No. CIVRS904268) |
| BROOKFIELD SOUTHLAND BUILDERS, INC., et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of San Bernardino County, David A. Williams, Judge.  Affirmed.

Donald E. Franzen and Elaine M. Franzen, in pro. per., for Plaintiffs and Appellants.

Songstad Randall Coffee & Humphrey, William D. Coffee and Garrett R. Rogers, for Defendants and Respondents.

Donald E. Franzen and Elaine M. Franzen bought a new residence in a housing development called Edenglen (the Development) located in the City of Ontario (the City). Within a year of moving into their new home, the Franzens sued the builder/developer, Brookfield Southland Builders, Inc. (Brookfield) and Edenglen Ontario LLC (Edenglen Ontario), and two real estate agents, Nguyet Minh Le and Francis Holmes Matthews III (collectively referred to as the Defendants), for rescission of the purchase and sale agreement. They claimed the Defendants misrepresented and/or concealed the proximity of the Ontario International Airport and did not disclose that their new home was in the flight path of overnight cargo flights from Ontario International Airport, which subjected them to extreme noise. In a bench trial, the trial court granted the Defendants' motion for judgment under Code of Civil Procedure section 631.8. The Franzens appeal raising numerous issues, none of which have merit. Accordingly, we affirm the judgment.

FACTS & PROCEDURE

*The Pleadings*

The Franzens' original four-page complaint, filed by an attorney on April 30, 2009, named only Brookfield and Edenglen Ontario as defendants. It contained a single cause of action for rescission of contract due to fraud under Civil Code section 1689, subdivision (b)(1). The complaint alleged the Franzens purchased a new home in the Development from Brookfield and Edenglen Ontario for $469,900, closed escrow on April 30, 2008, and moved into the house on May 3, 2008. As soon as they began sleeping in the house, they became aware of noise from Ontario International Airport and learned for the first time their new house was in the nighttime flight path for United Parcel Service (UPS) air cargo commercial aircraft flying in and out of Ontario International Airport. The complaint alleged Brookfield and Edenglen Ontario had a duty to disclose the house was in the nighttime flight path from Ontario International Airport and breached this duty. In February 2009, the Franzens

2

sent Brookfield and Edenglen Ontario a notice rescinding the purchase and sale agreement (the Purchase Agreement), but they refused to make restitution. The trial court denied Brookfield and Edenglen Ontario's motion for summary judgment.

Trial was set for October 24, 2011. On May 16, 2011, the trial court permitted the Franzens, now representing themselves in propria persona, to file a first amended complaint (FAC), which is the operative pleading. The FAC—comprised of 24 pages of allegations and approximately 300 pages of exhibits—contained 10 causes of action. Each cause of action was for rescission of the Purchase Agreement due to fraudulent concealment or misrepresentation of material facts concerning the Ontario International Airport's proximity to the Development and the nighttime cargo plane flight path. Le and Matthews, the real estate agents working in the Development's sales office with whom Franzens interacted when deciding to buy their house, were added as defendants.

The FAC alleged the Defendants did not disclose the property was in the direct nighttime flight path of Ontario International Airport air cargo operations and was within an "'Airport Influence Area.'"[1] Additionally, it alleged the Defendants did not disclose the Development was two miles from Ontario International Airport. Rather, the disclosures forms stated the Development was within five miles of the Ontario International Airport, which a reasonable person would think meant it was "closer to [five miles away] than to [one, two, three, or four] miles." The FAC alleged that although the Initial Study and Environmental Impact Report (EIR) prepared for the Development by the City under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), stated the Development was not in an

_____

[1] "[A]n 'airport influence area,' also known as an 'airport referral area,' is the area in which current or future airport-related noise, overflight, safety, or airspace protection factors may significantly affect land uses or necessitate restrictions on those uses as determined by an airport land use commission." (Civ. Code, § 4255, subd. (a)(2).)

3

Airport Influence Area and not directly under the airport flight path, the Defendants should have known that was incorrect because the City's 1992 General Plan showed the property to be within airport flight path noise contours. The FAC alleged the Defendants failed to disclose Ontario International Airport had obtained a prescriptive nighttime avigation (air flight) easement[2] over the property.

The FAC alleged that although the Franzens received an "Airport Proximity Notice," it only warned that residents "may . . . notice noise and vibration at any hour from overflying aircraft" without adequately explaining what that meant. The FAC alleged that when the Franzens visited the Development's sales office during daytime and early evening hours, they only observed high-flying aircraft over the Development, and were told by sales agent Matthews the property "would 'experience very little airplane noise.'" At various visits to the Development, the Franzens made comments to Matthews and Le about being pleased there would be little airplane noise and the sales agents did not contradict them. The FAC alleged one of the deciding factors for the Franzens in buying their house property was their understanding Ontario International Airport shut down and no planes flew after about 11 p.m. The FAC also alleged the Defendants did not disclose there was cargo jet air traffic from the Ontario International Airport from 10 p.m. until 7 a.m.

On August 5, 2011, the Franzens filed a motion for leave to file a second amended complaint. The proposed second amended complaint would have added 16 new defendants to the action including the City, title and escrow companies, mortgage lenders and servicers, Brookfield and Edenglen Ontario's predecessors in interest in the property that eventually became the Development, Brookfield and Edenglen Ontario's parent/or

---

2          "Avigation easements are private agreements that subject property to conditions caused by aircraft noise." (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1374, fn. 19.)

4

related companies, the Development's homeowners' association, and the private disclosure company that prepared some of the real estate transfer disclosures. The proposed second amended complaint contained allegations concerning how title was conveyed to and from Edenglen Ontario, the history of loan obligations and encumbrances on the property as it was developed, and would have added additional tort causes of action against the new defendants. On September 14, 2011, the trial court denied the motion to amend because the Franzens had not complied with California Rules of Court, rule 3.1324.

The trial was continued to November 7, 2011, and on October 25, the Franzens filed a second motion to file a second amended complaint. This proposed amendment did not include any new defendants (just the four named in the operative FAC). The amended pleading proposed to add allegations of mutual mistake as a ground for rescission of the Purchase Agreement. The trial court denied the motion to amend and observed the amendment was unnecessary because mutual mistake could be brought up during trial.

*Trial Evidence: Plaintiff's Case*

A two-day bench trial took place beginning November 8, 2011. The Franzens represented themselves. We begin with a description of relevant sales documents and disclosures, and environmental and land use documents that were admitted into evidence.

*Environmental and Land Use Documents*

The Development was a 160-acre project with over 500 residential units located in a larger area known as the New Model Colony—8,200 acres of agricultural land that was annexed to the City in 1999. The property was previously occupied by a dairy farm and one single family residence.

The EIR for the Development, which was required for City approval, was prepared by the City in July 2005—Brookfield and Edenglen Ontario did not participate

5

in preparing the EIR. The EIR contained information regarding the impact of Ontario International Airport operations on the Development. When the EIR was prepared, the City did not have an adopted airport land use plan. When the CEQA Initial Study for the Development was prepared, it was thought Ontario International Airport was within two miles of the Development, and thus applying CEQA Guidelines, it was within "the area of influence for public airports . . . ." However, after further investigation and measurement, Ontario International Airport was determined to be approximately 2.5 miles north of the project site, and thus it was not within the airport's area of influence. Accordingly to the City's 1992 General Plan, which discussed current and future operations of Ontario International Airport, the Development did not "directly lie within the flight path of [Ontario International Airport]. Aircraft from [Ontario International Airport] fly over the general project area in a southeasterly direction away from the [a]irport."

The EIR contained the following finding concerning impacts related to airport noise levels: "The project site is not located near the Ontario International Airport or the Chino Airport, and is not located within any airport comprehensive airport land use area. Therefore, no noise-related impacts related to aircraft or airport operations would result from implementation of the proposed project." No airport-related noise mitigation measures were required.

*Sales Documents*

The combined sales agreement, deposit receipt and joint escrow instructions (i.e., the Purchase Agreement) was admitted into evidence. It identified Edenglen Ontario as the seller and the Franzens as the buyers. The Purchase Agreement was executed by Brookfield, as Edenglen Ontario's authorized agent, and signed by Rocky Tracy, Brookfield's vice president. The Purchase Agreement was executed by Edenglen Ontario and the Franzens on March 31, 2008.

6

Several other documents associated with the sale, all signed on March 31, 2008, 30 days before escrow closed, were also admitted into evidence. They included the following reports and disclosures that included information regarding Ontario International Airport.

The Edenglen Community and Contiguous Area Disclosure (the Contiguous Area Disclosure) explained its purpose was to disclose "various matters" that might affect a buyers' decision to purchase a home in the Development. It stated much of the information it included came from sources outside Edenglen Ontario's control (including from government agencies) and it could not guarantee the accuracy or completeness of any of the information. The buyer was advised, "You should independently verify the information regarding any matter of concern to you. We also strongly recommend that you visit the [Development] and drive around the general vicinity surrounding the [Development] on at least several occasions on different days and at different times to familiarize yourself with physical and other conditions to determine whether there are material factors that might affect your decision to purchase a home in the [Development]. Since we cannot predict every circumstance that may be material to you, you must satisfy yourself about the decision to purchase a home by independently investigating all matters of concern to you."

The Contiguous Area Disclosure contained an "Airport Proximity Notice" that stated the Development was located "within the below estimated distance" of various airports, including that it was within five miles of Ontario International Airport. It stated, "Residents of [Edenglen] may notice noise and vibration at any hour from" Ontario International Airport.

The final section of the Contiguous Area Disclosure was titled "No Additional Representations." Its first paragraph stated in bold print that no promise or representation by any salesperson would be binding on Brookfield and Edenglen Ontario unless provided in writing by an authorized officer of Brookfield and Edenglen Ontario.

7

It additionally stated the buyer acknowledged, "[n]o representation or promise has been made to you by any salesperson . . . upon which you are relying in connection with the purchase of your [home]." The second, and final paragraph of the Contiguous Area Disclosure stated the Franzens "represent that [we] have read and understand the matters set forth in this [d]isclosure and have received a copy for [our] records. [We] acknowledge and agree that [we] are solely responsible to make certain that [we] understand the contents of this [d]isclosure and will take whatever steps are necessary to do so, including, without limitation, consulting an attorney, interpreter, engineer, or any other person whose advice or assistance may be necessary to fully understand the matters set forth herein. [We] acknowledge and agree that [we] have considered the possible effect of such matters in [our] decision to purchase [our] new home . . . ." The Franzens' initials were on each page of the Contiguous Area Disclosure, and their full signatures and the date March 31, 2008, were on the last page.

A California Department of Real Estate Public Report (the Public Report) was also provided to the Franzens. Their signatures, dated March 31, 2008, appear on a receipt for the Public Report below the words appearing in all capital letters, "do not sign this receipt until you have received a copy of the public report and have read it." In the section describing "significant land uses located in the vicinity of the [Development]," the Public Report states "the Ontario International is located approximately 2-1/2 miles [n]orthwest of this [c]ommunity." Under the heading "Airport," the Public Report states "[t]his [c]ommunity is subject to noise from the Ontario International Airport and may be severely impacted in the future."

The Franzens also signed on March 31, 2008, an acknowledgment of receipt of additional disclosures prepared by a third party company called Disclosure Source (the Additional Disclosures). The Additional Disclosures contained an "Airport Proximity Disclosure," stating Civil Code section 1102.17 requires, "'The seller of residential real property subject to this article who has actual knowledge that the

8

property is affected by or zoned to allow an industrial use described in [Code of Civil Procedure section 731a] shall give written notice of that knowledge as soon as practicable before transfer of title. [¶] Industrial use identified in [Code of Civil Procedure] [s]ection 731a includes but is not limited to airport uses. [¶] . . . [¶] According to the information available from the United States Department of Transportation (Bureau of Statistics) . . . the following aircraft landing facilities [are] within the estimated distance of the subject property. [¶] . . . [¶] Ontario International Airport . . . Commercial/Civilian/MI . . . 4.8 Miles." The Additional Disclosures document advised that "[f]or further information regarding any of the public aircraft landing facilities identified within this disclosure, please contact the following agency: [¶] Western Pacific Region Airports Division . . ." and that agency's address and telephone number were provided.

*Donald Franzen's Testimony*

Donald Franzen's testimony was presented via direct examination by his wife. He testified that when he and his wife purchased their house there was no mention of any nighttime air traffic over the Development. Donald Franzen testified that when he and his wife were at the Development during the daytime, they only saw high flying aircraft. When he commented on this to salesperson Matthews, Matthews said "'that's basically as loud as you're ever going to hear around here.'" Donald Franzen and his wife never went to the Development at night to check out the airport noise because as far as they knew, Ontario International Airport was closed by about 10 p.m. He testified they could not access their house while it was under construction without a salesperson, and thus could not get into it at night. He conceded there was a public street 100 to 200 feet away, and he and his wife could have accessed their street before close of escrow because there were already neighbors who had moved into their new homes.

Donald Franzen testified he was unaware when he bought his house that the Ontario International Airport flight path changes at night for UPS and FedEx cargo

9

flights into Ontario International Airport. Upon moving in, the Franzens discovered that at night, the cargo planes land and take off going west to east and then as soon as they clear the runway, they make a turn and fly directly over the Franzens' house. There are up to 10 such departures throughout each night. He would not have purchased the house had he been aware of the nighttime flight activity. After being in the house for a couple weeks, Donald Franzen saw salesperson Matthews and complained about the nighttime flight noise and said he felt it was unfair he and his wife had not been told about it before they bought the house. Matthews replied he was unaware of the nighttime flights but would "pass it along to corporate." A few weeks later, Matthews told Donald Franzen that when he told "the guy from corporate" about the nighttime flights, and that Matthews had never been aware of nighttime flights, "the guy" replied, "'Yes, but you've never spent the night out there."

Donald Franzen agreed he signed receipts for the disclosure documents before closing escrow. Before close of escrow he received the Contiguous Area Disclosure stating Ontario International Airport was within five miles of the Development, and could be subject to noise and vibration from the airport, but he understood "within five miles" to mean it was about five miles away. Donald Franzen testified he signed an acknowledgment of receipt of the Public Report, which stated Ontario International Airport was located about 2.5 miles from the Development and the Development was subject to noise from the Ontario International Airport. But he claimed he did not actually receive a copy of the Public Report until after escrow closed. He received the Additional Disclosures (stating the Ontario International Airport was within 4.8 miles) "at some point. Exactly what day I can't recall." He agreed the property was not in an Airport Influence Area when he bought it.

Donald Franzen testified he and his wife listed their house in the Development for sale in March 2009, but because the real estate market was dropping, they took it off the market. They moved out of the house about one month before trial

10

began in November 2011, because they "couldn't take listening to the airplanes flying overhead every night any longer." He had not yet decided if they would rent the house or try to sell it.

*Elaine Franzen's Testimony*

Elaine Franzen's testimony was presented via direct examination by her husband. Elaine Franzen testified she would not have bought the house had she known it was under the nighttime cargo flight path from Ontario International Airport. She testified similarly to her husband that when they visited the Development during the day, they did not notice any airport issues. The only disclosure she received was that the Ontario International Airport was within five miles of the Development, and she had no concerns about an airport five miles away. There was no disclosure the Development was in an Airport Influence Area. She considered the disclosure's statement the property could be subject to noise and vibration from the Ontario International Airport to be an opinion, not a fact.

Elaine Franzen testified it was her understanding flights from Ontario International Airport took off and landed going east to west. Additionally, she understood all flights out of Ontario International Airport stopped at 10 p.m. She had no notice there was any nighttime flight activity from Ontario International Airport. On cross-examination, however, Elaine Franzen conceded she was aware before she bought her house that UPS had a very large and extensive facility at Ontario International Airport because her son had worked there unloading UPS cargo planes at night. She did not attempt to measure the distance from the airport to her house before closing escrow. After she moved in, she drove the route and measured it at about 3.5 miles. She testified they did not receive the Public Report until after escrow closed.

Elaine Franzen testified the noise from the nighttime cargo flights was so overwhelming that she could not sleep and could no longer live in the house. The sleep disruption began immediately upon moving in. On direct examination by her husband,

11

Elaine Franzen testified about a promotional video for the Development in which she had appeared a few months after moving into her house. In the video, which was filmed during a neighborhood celebration, she commented on how wonderful the neighborhood was and she made no mention of the airplane noise at night. She testified she said nothing on the video about the nighttime noise because she did not want to dampen the celebration and was not thinking about the nighttime noise when the video was made. She testified that prior to being filmed, she had told the videographer that except for the airplane noise, the Development was wonderful.

*Scott Murphy's Testimony*

Scott Murphy was a City employee in its planning department who had been the City's project manager for the Development. He was responsible for overseeing preparation of the environmental review documents. The documents were prepared by consultants retained by the City. Brookfield and Edenglen Ontario did not prepare the EIR.

When Murphy originally prepared the CEQA Initial Study for the Development, he believed the Development was within two miles of Ontario International Airport so he considered it part of what CEQA Guidelines set as the Airport Influence Area. But, in preparing the EIR, the distance measured from the east end of the runway to the closest portion of the Development, was 2.5 miles, taking it out of the Airport Influence Area under CEQA Guidelines. Murphy estimated the distance from the west end of the runway to the Development would be about 3.5 miles.

Murphy testified that when the EIR was prepared, and the Development approved, the City's 1992 General Plan was the controlling airport land use plan. However, the area in which the Development lies had not yet been annexed to the City in 1992. Thus, the airport noise contours shown in the 1992 General Plan did not extend out to the Development. However, the farthest noise contour shown on the 1992 General Plan noise contour map was 65 decibels CNEL (community noise equivalent level), and

12

thus because the Development lay beyond that contour, Murphy and the EIR consultants determined the Development was at most at the 65 CNEL contour. The contour was based on measurements taken during the day and night—a weighted average with penalties added on for noise sources between 7 p.m. and 7 a.m. Under CEQA, only noise levels exceeding 65 CNEL would require any mitigation measures, thus the City did not require any airport-related noise mitigation for the Development.

Murphy testified the Development was not under the direct flight path of nighttime cargo flights from Ontario International Airport. Rather it was in the overfly zone when aircraft bank to the right after taking off from Ontario International Airport.

Murphy testified that in January 2010, the City adopted a new General Plan. In 2011, the City approved an airport land use compatibility plan, which significantly extends the area included within the Airport Influence Area beyond the prior two-mile radius, so the Airport Influence Area now includes the Development.

*Motion for Judgment/Ruling/Judgment*

At the close of the Franzens' case, the Defendants moved for judgment under Code of Civil Procedure section 631.8. They asserted no cause of action for rescission had been proven against Brookfield, Le, and Matthews because they were not parties to the Purchase Agreement—the contracting party was Edenglen Ontario. They asserted the Franzens had failed to prove any of the Defendants concealed or misrepresented any material facts or made any misrepresentations to them.

The trial court granted the motion for judgment. Neither party requested a statement of decision. In its oral ruling, the court explained the Franzens were asserting a single cause of action for rescission of the Purchase Agreement. Thus, the Defendants who were not parties to the contract—Brookfield, Le, and Matthews—were entitled to judgment in their favor. The court explained the necessary elements for rescission based on fraud or misrepresentation are a misrepresentation of a material fact; knowledge of the falsity; intent to deceive; justifiable reliance; and resulting damages. The court stated

13

damages were established by the Franzens' testimony that because of the noise from overflying aircraft at night they are unable to stay living in the house. But the court found there was no misrepresentation or concealment of a material fact, no intent to deceive, and no justifiable reliance.

The trial court observed that "from [the Franzens'] standpoint in this case, it was extremely unfair not to be told that at night they are within not necessarily the flight path of the airport but within an area where planes fly over anywhere from 2,500 to 3,500 feet. They felt it wasn't fair. You know, to a large extent it probably wasn't fair that they would have to check into all this. But from a legal standpoint, the evidence has to be presented in a certain way to prove that the defendant in this case actually made misrepresentations or concealed or nondisclosed." It found the Defendants used the best information they had—the information prepared by the City in the EIR—in the various disclosures given to the Franzens. The Contiguous Area Disclosure clearly laid out that the Development was within five miles of an airport, and there could be noise and vibration. The court essentially found Elaine Franzen's testimony she was unaware of nighttime activity at the airport, and that she relied on the real estate agents statements' that they had not heard noise from the airport, lacked credibility. Her son had worked at Ontario International Airport for UPS on the night shift unloading cargo planes. "It certainly should have occurred to you what time do these planes fly in? She had direct knowledge that [UPS] had that facility there. Anybody who's driven down [there] knows they have that facility there. You know, the regular person may not put two and two together. And it may lead to what certainly appears to be from the regular person's standpoint a completely unfair situation. And I have no doubt that it was probably an unfair situation, but I have to look at it legally." The court observed it was not clear exactly how far the Ontario International Airport was from the Development. Different agencies had different estimates, and as Murphy explained, the distance varied depending on where at the airport you measured from. The court found the uncontroverted evidence

14

was that the Development was not in an Airport Influence Area when approved (and when the Franzens bought their house) and the fact it was now in an Airport Influence Area had nothing to do with how close the Development was to the airport, but with how far out the new plan defined airport influence. The court subsequently entered a judgment in favor of all the Defendants and awarded them costs in the amount of $3,411.50.

## DISCUSSION

The Franzens' appellants' opening brief contains 17 separately numbered "issues" in the appeal. Most are repetitive and contain little or no legal analysis or citation to relevant legal authority. The arguments may be reasonably characterized as the following: (1) the judgment entered for the Defendants pursuant to Code of Civil Procedure section 631.8 is not supported by substantial evidence; (2) the failure to issue a statement of decision requires reversal; (3) the trial court abused its discretion by denying leave to file a second amended complaint; (4) the court abused its discretion in certain discovery rulings; and (5) the trial judge was biased.

Prior to addressing the Franzens' specific arguments, we repeat some familiar appellate rules. "A judgment or order of the lower court is *presumed correct*." (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*).) It is the appellants' burden to demonstrate the existence of reversible error. (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1996) 42 Cal.App.4th 608, 626.) An appellant acting in propria persona has the same burden to affirmatively demonstrate reversible error as one represented by counsel and is not entitled to special treatment. (*McComber v. Wells* (1999) 72 Cal.App.4th 512, 523.) "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived. [Citations.]" (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 (*Badie*); see also *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 (*Kim*) [same].)

15

*A.  Mootness*

The Defendants argue the Franzens' appeal is moot because on June 25, 2012, they sold the property and, thus, rescission of the Purchase Agreement is no longer possible.  On October 17, 2012, we denied the Defendants' motion to dismiss the appeal that raised the same mootness issue.  The appeal is not moot.  Although the status quo cannot be restored if the judgment is reversed and rescission ordered, the trial court has the authority to fashion a full and fair remedy including consequential damages for real estate commissions, escrow expenses, and interest on the money paid to purchase the property.  (Civ. Code, § 692; *Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1145.)

*B.  Pending Motions*

While this appeal has been pending, the Franzens have filed numerous motions to augment the record and/or to take judicial notice.  Two remain pending: (1) a request to take judicial notice filed November 16, 2012, which is a consolidation of three earlier requests; and (2) the Franzens' fifth request for judicial notice filed February 19, 2013.

The Franzens' November 16, 2012, request for judicial notice seeks to put before this court 30 documents that were not before the trial court when this matter was tried in November 2011.  The vast majority of the documents (exhibits 1 through 19, 24 through 26, and 29 and 30) were in existence well before the trial in this matter and the Franzens offer no coherent explanation as to why these documents were not presented below.  Exhibits 27 and 28 are two undated documents containing biographical information on the trial judge who presided over this matter.  Exhibits 20 through 23 are various documents recorded in 2012 (after the trial in this matter) pertaining to the Franzens' sale of the subject property via a "short-sale."

We deny the Franzens' November 16, 2012, request for judicial notice in its entirety because none of the proffered evidence was before the trial court when it issued the rulings that are the subject of this appeal.  "Reviewing courts generally do not take

16

judicial notice of evidence not presented to the trial court. Rather, normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' [Citation.] No exceptional circumstances exist that would justify deviating from that rule, either by taking judicial notice or exercising the power to take evidence under Code of Civil Procedure section 909. [Citations.]" (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 (*Vons*).)

The Franzens' February 19, 2013, request for judicial notice seeks to put before this court a photocopy of the Edenglen homeowners' association's monthly newsletter from the month August 2008. We deny the request for judicial notice for the reasons stated above—the proffered evidence was not before the trial court when it issued the rulings that are the subject of this appeal. (*Vons, supra,* 14 Cal.4th at p. 444, fn. 3.)

## C. *The Evidence Does Not Compel Finding as a Matter of Law in Favor of the Franzens*

The Franzens contend the trial court erred by granting the Defendants' motion for judgment under Code of Civil Procedure section 631.8. We find no error.

Code of Civil Procedure section 631.8 provides, in pertinent part: "(a) After a party has completed his presentation of evidence in a trial by the court, the other party . . . may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party, in which case the court shall make a statement of decision as provided in [Code of Civil Procedure] [s]ections 632 and 634, or may decline to render any judgment until the close of all the evidence. The court may consider all evidence received, provided, however, that the party against whom the motion for judgment has been made shall have had an opportunity to present additional evidence to rebut evidence received during the presentation of evidence deemed by the presenting party to have been adverse to him, and to rehabilitate the testimony of a witness whose credibility has been attacked by the moving party."

17

"'"'The purpose of Code of Civil Procedure section 631.8 is 'to enable the court, when it finds at the completion of plaintiff's case that the evidence does not justify requiring the defense to produce evidence, to weigh evidence and make findings of fact.' [Citation.] Under the statute, a court acting as trier of fact may enter judgment in favor of the defendant if the court concludes that the plaintiff failed to sustain its burden of proof. [Citation.] In making the ruling, the trial court assesses witness credibility and resolves conflicts in the evidence. [Citations.]"' [Citation.] [¶] '"The standard of review of a judgment and its underlying findings entered pursuant to [Code of Civil Procedure] section 631.8 is the same as a judgment granted after a trial in which evidence was produced by both sides. In other words, the findings supporting such a judgment 'are entitled to the same respect on appeal as are any other findings of a trial court, and are not erroneous if supported by substantial evidence.'"' [Citations.] '"[W]hen the decisive facts are undisputed, [however,] the reviewing court is confronted with a question of law and is not bound by the findings of the trial court. [Citation.] In other words, the appellate court is not bound by a trial court's interpretation of the law based on undisputed facts, but rather is free to draw its own conclusion of law."' [Citations.]" (*Plaza Home Mortgage, Inc. v. North American Title Co., Inc.* (2010) 184 Cal.App.4th 130, 135.)

Here, no party requested a statement of decision and none was prepared. The Franzens contend this alone requires reversal. But because "a statement of decision was not timely requested as required by [Code of Civil Procedure] sections 631.8 and 632 [it] was therefore waived. [Citation.]" (*Tusher v. Gabrielsen* (1998) 68 Cal.App.4th 131, 140, fns. omitted (*Tusher*).) Although Code of Civil Procedure section 631.8 provides that when granting a motion for judgment, "the court shall make a statement of decision as provided in [Code of Civil Procedure] [s]ections 632 and 634," Code of Civil Procedure section 632, requires a statement of decision only upon request. Accordingly, on "a motion for judgment under [Code of Civil Procedure] section 631.8[, i]t is

18

clear . . . that no statement is required unless timely requested by a party. [Citations.]" (*Tusher, supra,* 68 Cal.App.4th at p. 140, fn. 10; see also *Newby v. Alto Riviera Apartments* (1976) 60 Cal.App.3d 288, 304 [trial court required to make findings "when requested"] disapproved on another ground in *Marina Point Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 740, fn. 9.) Because there was no statement of decision, under the doctrine of implied findings, we infer the trial court made any and all findings necessary to support the judgment, and review the implied findings under the substantial evidence standard. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1134; *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 61-62.)

Although the Franzens' FAC purported to allege 10 separate causes of action, as they repeatedly represented below, and as the trial court observed in granting the motion for judgment, they were asserting but a single cause of action for rescission of the Purchase Agreement due to fraud. The Franzens generally contended the Defendants intentionally misrepresented the proximity of Ontario International Airport to the Development, and they concealed the Development was in an Airport Influence Area and under the nighttime flight path of cargo flights. The Franzens claimed that had they known the true facts, they would not have purchased the home.

The grounds for rescinding a contract are set forth in Civil Code section 1689. It provides in relevant part that a contract may be rescinded, "If the consent of the party rescinding . . . was given by mistake, or obtained through . . . fraud, or undue influence, exercised by . . . the party as to whom he rescinds . . . ." (Civ. Code, § 1689, subd. (b)(1).) The elements of a claim based on fraud are: (1) a misrepresentation, (2) knowledge of the falsity, (3) intent to defraud or induce reliance, (4) justifiable reliance, and (5) resulting damage. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) In its oral ruling, the trial court stated many of the elements were lacking in proof. The court stated Franzens failed to prove the Defendants misrepresented or concealed a material fact or had an intent to deceive, and they failed to prove justifiable reliance.

19

Although the standard of review is substantial evidence, "In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case. [Citations.] [¶] 'Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citation.]' [Citation.]" (*Valero v. Board of Retirement of Tulare County Employees' Assn.* (2012) 205 Cal.App.4th 960, 965-966 (*Valero*); see also *Roesch v. De Mota* (1944) 24 Cal.2d 563, 570-571; *Caron v. Andrew* (1955) 133 Cal.App.2d 402, 409.)

Rescission based on fraud or mistake requires justifiable reliance. (*Lawrence v. Doty* (1950) 96 Cal.App.2d 937, 942.) The Franzens bore the burden to prove they justifiably relied on the disclosures they received to constitute representations by the Defendants that the Ontario International Airport could have no negative impact on their enjoyment of property. The evidence presented did not compel a finding in their favor on this point, and in fact strongly suggested just the opposite.

"'If the conduct of the plaintiff in the light of his [or her] own intelligence and information was manifestly unreasonable . . . he [or she] will be denied a recovery.' [Citation.]" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240.) A buyer's failure to ascertain the precise nature and scope of a disclosed property condition can defeat the claim that there was actual and justifiable reliance. (Civ. Code,

20

§§ 2079; 2079.5; *Pagano v. Krohn* (1997) 60 Cal.App.4th 1, 12 (*Pagano*).) When a buyer is apprised of information potentially affecting the value and desirability of the property, the burden is on the buyer to investigate the problem and assess its severity. (*Assilzadeh v. California Federal Bank* (2000) 82 Cal.App.4th 399, 412 [disclosure of construction defect litigation that was settled]; *Pagano, supra,* 60 Cal.App.4th. at pp. 8-9 [water intrusion problems].) "[N]eglect of a legal duty" precludes rescission based on mistake. (Civ. Code, § 1577; *Lawrence v. Shutt* (1969) 269 Cal.App.2d 749, 765-766.)

Furthermore, "A seller's duty of disclosure is limited to material facts; once the essential facts are disclosed a seller is not under a duty to provide details that would merely serve to elaborate on the disclosed facts. [Citation.]" (*Calemine v. Samuelson* (2009) 171 Cal.App.4th 153, 161; *Pagano, supra,* 60 Cal.App.4th at pp. 8-9.) Merely "because a buyer has a right to rely on the representations of a seller or a seller's agent does not mean that the buyer has no duty to inspect the property to be purchased. When there is a duty, a failure to inspect the property may be below the standard of care and negligence and, in some cases, may preclude a finding of justifiable reliance on the other party's misrepresentation or failure to disclose." (1 Miller & Starr, Cal. Real Estate (3rd ed. 2013) § 1:149, pp. 607-608.) "The test is not only whether the [buyer] acted in reliance upon a misrepresentation, but whether he was justified in his reliance. [Citation.]" (*Kahn v. Lischner* (1954) 128 Cal.App.2d 480, 489.)

The Franzens visited the Development several times before the close of escrow and were provided with various disclosures about the Ontario International Airport. The Defendants had no basis for disclosing the Development was directly under the Ontario International Airport overnight flight path—the EIR prepared by the City, specifically stated the Development "does not directly lie within the flight path of [Ontario International Airport]" and found "no noise related impacts related to aircraft or airport operations would result from implementation of the proposed project." Murphy testified the Development was not in the direct flight path, but rather in the overfly area

21

when aircraft banked to the right after taking off from the Ontario International Airport. At the time the Development was built, it was not within an Airport Influence Area.

That aircraft from the Ontario International Airport would fly over the area and could disrupt them *was* disclosed to the Franzens. The Contiguous Area Disclosure stated the Ontario International Airport was within five miles of the Development and "[r]esidents of the [c]ommunity may notice noise and vibration *at any hour* from overflying aircraft traveling to or from" Ontario International Airport. (Italics added.) The Public Report stated the Ontario International Airport was approximately two and one-half miles northwest of the Development and "this [c]ommunity is subject to noise from the Ontario International Airport and may be severely impacted in the future." The Additional Disclosures advised the Development was affected by the Ontario International Airport, which pursuant to information available from the United States Department of Transportation was within 4.8 miles of the Development. The disclosure documents warned the Franzens they should independently verify the information, should visit the Development on different days and at different times of day to familiarize themselves with conditions that might materially affect their purchase decision, and gave them specific contact information for the governmental agency that could give more information.

The Franzens testified they did not undertake any investigation to determine whether the Ontario International Airport operated during nighttime hours or to verify its distance from their house. Both testified that although they could not access their specific house at night (because it was still under construction), they could have accessed the street their house was on (neighbors had already moved in) and there was a public street within 100 to 200 feet. Both testified they had no reason to suspect there was any nighttime activity because they believed the airport shutdown at night. But the court found that claim to lack credibility particularly in view of Elaine Franzen's testimony she knew UPS had a very large cargo facility at Ontario International Airport

22

and her son worked there in the nighttime unloading UPS cargo planes. The trial court could also reasonably find the Franzens did not justifiably rely on alleged verbal representations made by Matthews and Le, in view of the numerous documents they signed specifically acknowledging the sales associates had no authority to make representations and they did not rely on any representations made by the sales associates.

Justifiable reliance is a question of fact and, in this case, for the trial court's determination. (*Guido v. Koopman* (1991) 1 Cal.App.4th 837, 843; *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503 (*Gray*).) "[T]he issue is whether the person who claims reliance was justified in believing the representation in the light of his own knowledge and experience. [Citations.]" (*Gray, supra,* 35 Cal.3d at p. 503.) On review, we are precluded from reweighing the evidence or determining witness credibility. The Franzens make no showing the evidence is so "'"uncontradicted and unimpeached"'" that it compels a finding of justifiable reliance or reasonable mistake. (*Valero, supra,* 205 Cal.App.4th at pp. 965-966.) Because the justifiable reliance element was lacking, the trial court properly entered judgment for the Defendants.[3]

D. *Denial of Leave to Amend*

The Franzens contend the trial court erred by denying their request for leave to file a second amended complaint. The Franzens made two such motions, but their arguments on appeal appear to pertain to the first. The Franzens' first request to file a second amended complaint was filed on August 5, 2011. The trial was set to begin on October 24, 2011, and discovery had been completed. The Franzens proposed to add 16 new defendants to the action including the City, title and escrow companies, mortgage lenders and servicers, Brookfield's parent company and/or a Brookfield-related company

---

[3]    A separate reason for affirming the judgment in favor of Brookfield, Matthews, and Le is that they were not contracting parties and thus not the proper object of the Franzens' rescission claim. Civil Code section 1689 limits rescission to the contracting parties. (See *Schauer v. Mandarin Gems of California, Inc.* (2005) 125 Cal.App.4th 949, 959-960.)

23

(Brookfield Residential and Brookfield Homes Southern California), Brookfield and Edenglen Ontario's predecessors in interest in the property that eventually became the Development, the Development's homeowner's association, and the private disclosure company that prepared some of the real estate transfer disclosures. They sought to add allegations concerning how title was conveyed to and from Edenglen Ontario, the history of loan obligations and encumbrances on the property as it was developed, and would have added additional tort causes of action against the various new defendants. The trial court denied the motion to amend because the Franzens had not complied with California Rules of Court, rule 3.1324.

On appeal, the Franzens raise numerous arguments pertaining to the validity of their claims against some of the additional defendants they aimed to bring into this lawsuit. For example, they argue they had valid causes of action against the City as a third party beneficiary of the Purchase Agreement because the Development's master declaration covenants, conditions, and restrictions (CC&Rs) state they are for the benefit of the City (among others) and may be enforced by the City. They argue that because the Purchase Agreement and other sales-related documents bear the logo "Brookfield Homes" on top, the other Brookfield entities (e.g., Brookfield Residential and Brookfield Homes Southern California) are "indispensible parties." What they do not argue is that the trial court's reasons for denying leave to amend were in error.

"'Leave to amend a complaint is . . . entrusted to the sound discretion of the trial court. " . . . The exercise of that discretion will not be disturbed on appeal absent a clear showing of abuse. *More importantly, the discretion to be exercised is that of the trial court, not that of the reviewing court.* Thus, even if the reviewing court might have ruled otherwise in the first instance, the trial court's order will yet not be reversed unless, as a matter of law, it is not supported by the record.'" [Citations.]" (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 242.)

California Rules of Court, rule 3.1324 sets forth the procedural requirements of a motion to amend a pleading before trial. The motion must state what allegations are to be deleted or added and demonstrate "where, by page, paragraph, and line number, the deleted [or added] allegations are located." (Cal. Rules of Court, rule 3.1324(a)(2), (3).) The motion must be accompanied by a declaration specifying, "(1) The effect of the amendment; [¶] (2) Why the amendment is necessary and proper; [¶] (3) When the facts giving rise to the amended allegations were discovered; and [¶] (4) The reasons why the request for amendment was not made earlier." (Cal. Rules of Court, rule 3.1324(b)(1)-(4).) The Franzens have not demonstrated their motion to amend the complaint complied with the Rules of Court. We observe the record supports the trial court's conclusion it did not. In particular the motion did not explain by reference to page, paragraph, and line number what allegations were being added or deleted, there was no showing as to when the facts underlying the amendment were discovered or why the Franzens waited until two months before trial to amend the complaint. In short, they have failed to carry their appellate burden to demonstrate the court's decision "exceeds the bounds of reason." (*Denham*, *supra*, 2 Cal.3d at p. 566.)

*E. Discovery Ruling*

Within one of their arguments concerning denial of leave to file a second amended complaint, argument number 8, we discern an attempt by the Franzens at challenging a particular discovery ruling by the trial court. They assert in passing the trial court should have granted their motion to compel discovery of documents relating to the documents the Defendants relied upon in creating the various disclosure statements. The argument is devoid of any legal analysis, citation to relevant legal authority, or any attempt to demonstrate the trial court abused its discretion in any of its discovery rulings. Accordingly, we decline to consider the point further. (*Badie, supra,* 67 Cal.App.4th at pp. 784-785; *Kim, supra,* 17 Cal.App.4th at p. 979.)

25

*F. Judicial Bias*

The Franzens argue the trial judge was inherently prejudiced against them because before his appointment to the bench as a private attorney: (1) he once represented a title insurance company that was somehow affiliated with the company that prepared the Additional Disclosures document and that title insurance company was once a client of the Defendants' attorneys' law firm; and (2) he represented developers and governmental agencies. The Franzens cite to nothing in the record on appeal to support their factual assertions. At no time did they move to disqualify the trial judge, which was their remedy for perceived judicial bias (Code Civ. Proc., § 170.3), and their failure to do so precludes them from raising this issue on appeal (*Tri Counties Bank v. Superior Court* (2008) 167 Cal.App.4th 1332, 1337-1338; see also *People v. Scott* (1997) 15 Cal.4th 1188, 1207). Furthermore, the Franzens' argument is devoid of any legal analysis or citation to legal authority and we need not consider the point further. (*Badie, supra,* 67 Cal.App.4th at pp. 784-785; *Kim, supra,* 17 Cal.App.4th at p. 979.)

DISPOSITION

The judgment is affirmed. Appellants' requests for judicial notice filed November 16, 2012, and February 19, 2013, are denied. Respondents are awarded their costs on appeal.

O'LEARY, P. J.

WE CONCUR:

FYBEL, J.

IKOLA, J.

26