Filed 9/1/16  LTL Commercial v. Hammer IRP LTL Assoc. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LTL COMMERCIAL, LLC, | B262176 (consolidated w/ B263715) |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC500790) |
| v. | |
| HAMMER IRP LTL ASSOCIATES, LLC, | |
| Defendant and Appellant. | |

APPEAL from a judgment and an order of the Superior Court of Los Angeles County.  Frederick Carl Shaller, Judge.  Affirmed.

Ogletree, Deakins, Nash, Smoak & Stewart, Christopher F. Wong, Kathleen J. Choi and Jack S. Sholkoff, for Plaintiff and Appellant.

Allen Matkins Leck Gamble Mallory & Natsis, Patrick E. Breen and Matthew J. Marino, for Defendant and Appellant.

* * * * * *

The owner of the commercial space in a mixed-use building brought a lawsuit in 2014 against the developer who did cosmetic work to the building while converting its upper floors from apartments to condominiums, alleging that the developer negligently failed to inspect the building for water intrusion issues before selling the commercial space in 2007. The trial court granted summary judgment to the developer, concluding that the owner's lawsuit was barred by the statute of limitations and by two separate contractual releases. The developer moved for more than $200,000 in attorney's fees, and the court denied that request. The owner and developer appeal. We agree with the court's resolution of most of these issues, and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *The Building in Little Tokyo*

The building at issue in this case is a six-story building located on South San Pedro Street, on the edge of Little Tokyo in downtown Los Angeles. Built in the 1920's, it was put to industrial use until 2001. At that time, its then-current owner converted all but the first floor to apartments. Defendant Hammer IRP LTL Associates (the developer) acquired the building in 2005, and did some "cosmetic work" on the building's interior in the process of converting the apartments on the second through sixth floors into 161 condominiums. The building is now referred to as the Little Tokyo Lofts building.

#### B. *The Mutual Benefit Agreement (MBA)*

Anticipating that the first-floor commercial space would be sold to a different owner than the condos on the upper floors, the developer in 2006 entered into a Mutual Benefit Agreement (MBA) with the condo owners' residential association to delineate the rights and responsibilities of the various owners of the now, mixed-used building. The MBA divides the building into a "Commercial Area" and a "Residential Area," and defines the maintenance duties (1) for the owner of the commercial space, (2) for the residential association, and (3) to be shared by both groups. The commercial owner is obligated to "maintain, repair and replace the components in the Commercial Area" as well as "any other components of the Project that are directly adjacent to *and primarily*

2

*serve* the Commercial Area that are not" shared maintenance duties or duties belonging to the residential association. (Italics added.) The commercial owner and residential association are jointly obligated to "maintain[], repair and replace[]," as pertinent to this case, (1) "those improvements on the Residential Association Property that are *jointly used* by the Residential Association and Commercial Owner, including without limitation . . . water heaters, storage tanks, heating boilers, heating water pumps, condenser water pumps," and (2) "all building mechanical systems and their components that (a) are not the responsibility of the individual owners of the commercial or residential units, or (b) do not solely serve either the Commercial Area or the Residential Area." (Italics added.) The residential association is obligated to "maintain, repair and replace" all remaining portions of the building.

The MBA grants the commercial owner and residential owners various levels of access to the other's space. Each has a nonexclusive easement across the other's space to perform their respective maintenance duties. Each also has a nonexclusive utility easement across the other's space to install, maintain, remove, replace, modify, or upgrade various utility systems, including "water mains, sewers, fire sprinkler system lines, telephones, electrical and communications conduits or systems, gas mains and other utilities and services." And where an owner is affected by a "structural element[] of the building" physically located in the other's space that needs repair, the owner is to give written notice and the owners are to "jointly adopt a plan for the investigation of the need for such structural repair or reinforcement."

### C.    *Sale of Commercial Area*

In March 2007, the developer sold the commercial space to Steve Lee (Lee). The sale was memorialized in a 2007 Agreement of Purchase and Sale and Joint Escrow Instructions (Purchase Agreement), as well as an amendment to the Purchase Agreement. In the Purchase Agreement, the developer agreed to sell "the Property" to Lee, and defined "the Property" as the legal property interest corresponding to the Commercial Area (rather than the whole building). Lee was given the right to physically inspect "the Property."

3

Consistent with the Purchase Agreement's acknowledgment that the developer "did not . . . construct the Property," section 24.3 of the Purchase Agreement further provided that the Property was being sold in an "as is condition"—that is, "to the maximum extent permitted by law, the sale of the Property as provided for herein is made on an 'as is' condition and basis with all faults, and that [the developer] has no obligations to make repairs, replacements or improvements except as may otherwise be expressly stated herein . . . ." Specifically, Lee "acknowledge[d] and agree[d] that . . . [the developer] has not made, does not make and specifically negates and disclaims any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning or with respect to" 18 different categories, including, as pertinent here, "([8]) the manner or quality of the construction or materials, if any, incorporated into the Property," and "([18]) with respect to any other matter, [Lee] further acknowledges and agrees that having been given the opportunity to inspect the Property and review information and documentation affecting the Property, [Lee] is relying solely on [his] own investigation of the Property and review of such information and documentation, and not on any information provided or to be provided by [the developer]."[1]

Both section 24.3 and section 26 of the Purchase Agreement released the developer from future claims by Lee. Section 24.3 provided that Lee "agrees to fully and irrevocably release [the developer] from any and all claims that [Lee and his assignees] may now have or hereafter acquire against [the developer] for any costs, loss, liability, damage, expense, demand, action or cause of action arising from such information or documentation." Tracking this language, section 26 provided that Lee "shall rely solely upon [his] own knowledge of the Property based on [his] investigation of the Property and its own inspection of the Property in determining the Property's condition" and that

---

[1]    The "as is" clause itself is set forth in ALL CAPS, but we eliminated that convention in this opinion to make the text easier to read.

4

Lee "hereby waives [his] right to recover from and fully and irrevocably releases [the developer] . . . from any and all claims that [Lee and his assignees] . . . may now have or hereafter acquire against [the developer] for any loss, liability, damage, obligation, cost or expense, . . . demand, action, cause of action, directive, or judgment . . . arising from or related to the Property."

The Purchase Agreement also has an attorney's fees provision.

Lee inspected the building's commercial space himself.  Lee did not observe any water damage at the time, although the current commercial tenant told him about "some water leaks" the tenant had experienced in the past.  In the amendment to the Purchase Agreement, Lee "approve[d] of the Property and all matters in connection with the Property."

Soon after the sale went through, Lee assigned his rights under the Purchase Agreement to plaintiff LTL Commercial, LLC (LTL).

### D.     *Water Intrusions in 2007 and 2008*

In late 2007 or early 2008, LTL's commercial tenants reported to LTL that they were experiencing "some water intrusion," such as "water drops," but nothing "serious." The commercial space did not experience any further leaks in 2008 or in 2009.

### E.     *LTL's 2009 Lawsuit, Settlement & Release*

In 2009, LTL sued the developer for breach of a covenant running with the land and intentional interference with contractual relations, alleging that the condo residents had "engaged in a concerted effort and pattern of conduct designed to harass, intimidate and interfere with" the homeless customers of one of the commercial tenants.[2]

LTL settled with the developer in 2010.  In a Settlement Agreement and Mutual Release, dated December 28, 2010 (2010 Settlement Agreement), LTL agreed to dismiss its claims against the developer.  Both LTL and the developer also agreed to a "mutual release," which provides that each party "[1] irrevocably and unconditionally release[s]

---

[2]     LTL also sued the residential association for all of the above-detailed claims, plus a claim for breach of contract.

and forever discharge[s] the other . . . from any and all actions, suits, causes of action, claims, rights, damages, losses, costs, and expenses . . . of any nature whatsoever, known or unknown, suspected or unsuspected . . . arising out of the claims, allegations or defenses raised against each other in the [2009] Action . . . .  [2] This release also includes any claims by [LTL or the developer] regarding alleged misrepresentations or other alleged wrongful conduct in connection with the sale of the commercial unit at the Little Tokyo Lofts project by [the developer] to [LTL] and/or its principal, Steve Lee, as well as any alleged breaches of the MBA . . . by the Parties hereto and any other claims relating to either Party's ownership, use or occupancy of their respective property at the Little Tokyo Lofts project based on actions taken prior to the date of this Settlement Agreement."  LTL and the developer agreed that the release reaches "unknown claims" based on "additional or different facts."  The release has an exception:  "[T]he Parties agree that they do not intend to release or waive, and are not releasing or waiving, any of their existing or future rights and obligations under (i) the [Purchase Agreement], and (ii) the [MBA], the terms of which survive this Settlement Agreement and remain in full force and effect hereafter."

The 2010 Settlement Agreement also had an attorney's fees provision.

### F.      *Further Water Intrusions*

There was a further "water intrusion" on October 15, 2010.  There was another on March 4, 2011.  As to the latter, an LTL employee sent the residential association an e-mail, indicating that "water leaking from above the [commercial] unit in which we are doing construction" had "already stained" "[o]ur newly installed ceiling tiles."  Five days later, the LTL employee sent another e-mail to the residential association reporting "another leak problem" in a different location from the one reported five days earlier. Lee felt these leaks were "innocuous" and "not severe enough to cause [him] to believe that the Commercial Space had a serious or persistent water intrusion problem."  Lee and LTL took no further action to investigate or remedy the leaks.

But the water intrusions continued.  There were further intrusions into the commercial space on March 18, 2011; March 23, 2011; April 15, 2011; June 29, 2011;

6

July 6, 2011; September 29, 2011; October 4, 2011; October 20, 2011; October 21, 2011; November 8, 2011; February 27, 2012; July 18, 2012; October 1, 2012; November 21, 2012; December 28, 2012; and January 30, 2013.  On December 31, 2012, water "stream[ed]" into the commercial space.

## II.     Procedural History

### A.     Initial Pleadings

On February 8, 2013, LTL sued the residential association and unknown "Doe" defendants for (1) breach of contract, (2) declaratory relief, and (3) an accounting.  The breach of contract claim was based in part upon the allegation that since "at least 2010, the Commercial Space has repeatedly been subjected to water intrusion due to water leaking from the residential units and other areas."  Nearly a year later, LTL filed a first amended complaint adding two more claims against the residential association for trespass and nuisance, both based upon the water intrusions.

### B.     Operative Pleading

On March 13, 2014, LTL filed its second amended complaint (SAC).  This complaint substitutes the developer for a prior, unnamed "Doe" defendant and adds a single cause of action against the developer for negligence.  Specifically, the SAC alleges that the developer "breached its duty of care to [LTL] and failed to exercise reasonable care in that it failed to properly design, prepare, investigate, supervise, construct and inspect the Little Tokyo Lofts property to ensure that the property would be in a sound condition that would not allow water intrusion problems and other conditions that occurred."[3]

### C.     The Developer's Motion for Summary Judgment

The developer moved for summary judgment on the ground that LTL's negligence claim was untimely and also barred by the release provisions of the Purchase Agreement and the 2010 Settlement Agreement.  After further briefing and a hearing, the trial court

---

[3]     The developer filed a cross-complaint against the residential association alleging claims for contractual indemnity, equitable/comparative indemnity and declaratory relief.  That cross-action is not implicated in this appeal.

issued a 26-page minute order granting the motion on three grounds. First, the court ruled that the provisions in the Purchase Agreement barred LTL's claim, reasoning that the "as is" condition and related release provision applied not only to the commercial space of the building, but also to other areas because the commercial "property and the residential units are all part of one building" and "share . . . commonalities attendant to being part of the same building" and because the MBA granted the commercial owner "certain rights with respect to the project's common area." Second, the court ruled that the release provisions of the 2010 Settlement Agreement applied. Lastly, the court ruled that LTL's negligence claim was "barred by the applicable three-year statute of limitations . . . because the claim accrued no later than 3/4/11, when [LTL] confirmed, in writing, that water intrusion and property damage occurred at the premises" after experiencing earlier water intrusion and property damage "at or around the time of closing in 2007" and on October 15, 2010. Because LTL was not "'genuinely ignorant' of the [developer's] identity," LTL's substitution of the developer as a "Doe" defendant did not relate back to the date of the original complaint in 2013.

### D.       *The Developer's Motion for Attorney's Fees*

After the trial court entered an order dismissing LTL's negligence claim, the developer moved to recover $208,479.30 in attorney's fees under the attorney's fees provision of the Purchase Agreement. In its reply, the developer also invoked the attorney's fees provision in the 2010 Settlement Agreement. The court denied the motion in a 15-page written minute order, concluding that the language in the Purchase Agreement "was narrow and . . . does not permit an award of fees under the circumstances present in this case."

### E.       *Notices of Appeal*

LTL filed a timely notice of appeal. So did the developer. We consolidated the two appeals.

8

# DISCUSSION

## I.     LTL's Appeal of the Summary Judgment Ruling

A party in a civil case is entitled to summary judgment if it can "show that there is no triable issue as to any material fact and that [it] is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)  Among other things, the moving party can show that it has a valid affirmative defense (*id.*, subds. (o) & (p)(2)), including that the plaintiff's claim is barred by the statute of limitations (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 810 (*Fox*)) or by a contractual release (*Jefferson v. Department of Youth Authority* (2002) 28 Cal.4th 299, 301; *Skrbina v. Fleming Companies* (1996) 45 Cal.App.4th 1353, 1366 (*Skrbina*)).  Once the moving party makes this showing, the "burden shifts" to the opposing party to show a "triable issue of one or more material facts . . . as to that . . . defense." (Code Civ. Proc., § 437c, subds. (o) & (p)(2).)  "'There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.'" (*Burgueno v. Regents of University of California* (2015) 243 Cal.App.4th 1052, 1057, quoting *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)  On appeal, we independently review the trial court's ruling (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 415), by reviewing the record as a whole and resolving any evidentiary doubts or ambiguities against the grant of summary judgment (*Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 605-606).  What matters is the trial court's ruling, not its reasoning.  (*Burgueno*, at p. 1057.)

### A.     Statute of Limitations Defense

A plaintiff bringing a claim for "injury to real property" must do so within three years of when its claim accrues.  (Code Civ. Proc., §§ 335 & 338, subd. (b); *Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 931 (*Bernson*).)  "'[A] cause of action for damage to real property accrues when the defendant's act causes "'immediate and permanent injury'" to the property or . . . when there is "'[a]ctual and appreciable harm'" to the property.'" (*Stofer v. Shapell Industries, Inc.* (2015) 233 Cal.App.4th 176,

9

189, quoting *Krusi v. S.J. Amoroso Construction Co.* (2000) 81 Cal.App.4th 995, 1005.) The injury or harm must be more than nominal (*Miller v. Lakeside Village Condominium Assn.* (1991) 1 Cal.App.4th 1611, 1622 (*Miller*)), but need not be "continuous" or "repeated" (*Lyles v. State of California* (2007) 153 Cal.App.4th 281, 289 (*Lyles*)).

Because a rule pegged solely to the fact of injury can be "harsh" and "manifestly unjust" (*Leaf v. City of San Mateo* (1980) 104 Cal.App.3d 398, 406-407 (*Leaf*)), courts sometimes employ a "discovery rule" that postpones the accrual of the claim (and hence the running of the three-year limitations period) until the earlier of when the """"plaintiff either (1) actually discovered his injury and its negligent cause or (2) could have discovered [the] injury and cause through the exercise of reasonable diligence." [Citation.]'" (*CAMSI IV v. Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525, 1536.) Under the latter prong, the limitations period will begin to run once the facts available to the plaintiff would cause a reasonable person to suspect that he has been injured and that his injury was due to someone's wrongful conduct. (*Nguyen v. Western Digital Corp.* (2014) 229 Cal.App.4th 1522, 1551 (*Nguyen*).) "'Wrong' is not used in a technical sense, but in a lay one." (*Creekridge Townhome Owners Assn., Inc. v. C. Scott Whitten, Inc.* (2009) 177 Cal.App.4th 251, 258 (*Creekridge Townhome Owners*).) Consequently, the limitations clock will start ticking even if the plaintiff does not know "'the specific "facts" necessary to establish [his potential] claim'" (*Nguyen*, at p. 1551) or the full extent of his injury (*Miller*, *supra*, 1 Cal.App.4th at p. 1623), and even if the plaintiff has not investigated his suspicion (*Landale-Cameron Court, Inc. v. Ahonen* (2007) 155 Cal.App.4th 1401, 1408 (*Landale-Cameron Court*)). The discovery rule applies to negligence claims involving latent defects in property. (*William L. Lyon & Associates, Inc. v. Superior Court* (2012) 204 Cal.App.4th 1294, 1308.)

The undisputed facts in this case dictate a finding that a reasonable person standing in LTL's shoes would have suspected that it had been injured due to the developer's negligence no later than March 9, 2011. By that time, LTL's commercial tenants had experienced water intrusions prior to the 2007 sale, immediately after the sale, in October 2010, on March 4, 2011, and on March 9, 2011. One or two leaks might

10

be reasonably viewed as isolated incidents due to upstairs owners' negligence and might not give rise to a suspicion that there was something wrong with the building. (E.g., *Creekridge Townhome Owners*, *supra*, 177 Cal.App.4th at pp. 254-259 [plaintiff did not have reasonable basis to suspect "water moisture problem" with building based solely a single, earlier leak in one condo unit that was accompanied by report of several broken roof tiles on that unit].) But by March 9, 2011, there had been at least five water intrusion events. By that point in time, a reasonable person would suspect that the building was somehow to blame. (Accord, *Landale-Cameron Court*, *supra*, 155 Cal.App.4th at pp. 1404-1408 [plaintiff should have suspected construction defect after multiple leaks]; *Anderson v. Brouwer* (1979) 99 Cal.App.3d 176, 181 [multiple defects in building soon after its construction gives rise to reasonable suspicion of latent construction defect].) What is more, the only entity responsible for the building's condition in this case was the developer. (*Anderson*, at p. 181; see also *Lyles*, *supra*, 153 Cal.App.4th at p. 287 ["when property is damaged, there is ordinarily some wrongful cause" and "one should reasonably suspect that someone has done something wrong to him"].) As a result, the limitations clock on LTL's negligence claim against the developer began to run no later than March 9, 2011. Because LTL did not sue the developer until March 13, 2014, its claim is untimely under the applicable three-year statute of limitations.

LTL raises what amounts to four challenges to this reasoning. First, LTL argues that the applicability of the statute of limitations is """"normally a question of fact"""" to be resolved at trial, not on summary judgment. (*Nguyen*, *supra*, 229 Cal.App.4th at p. 1552; *Allen v. Sundean* (1982) 137 Cal.App.3d 216, 222 (*Allen*).) """"However, when reasonable minds can draw only one conclusion from the evidence, the question becomes one of law"""" (*Nguyen*, at p. 1552), and thus one that may properly be decided on summary judgment.

Second, LTL asserts that the limitations period begins to run only after it has suffered "sufficiently appreciable" damage, and that the first incident causing such damage was the "streaming" leak that occurred on December 31, 2012. We reject this

11

argument for several reasons. To the extent LTL is arguing that its cause of action did not *accrue* at all until December 31, 2012, that argument lacks merit because, as noted above, a cause of action accrues once the damage is more than "nominal" (*Miller*, *supra*, 1 Cal.App.4th at p. 1622), and because one of LTL's commercial tenants had suffered damage to its ceiling tiles on or before March 4, 2011. Further, the "sufficiently appreciable" damage test LTL proffers arose in cases involving presentation of claims to insurance companies under Insurance Code section 2071 (*Prudential-LMI Com. Insurance v. Superior Court* (1990) 51 Cal.3d 674, 686-687 [using "appreciable damage" test]; *Doheny Park Terrace Homeowners Assn., Inc. v. Truck Ins. Exchange* (2005) 132 Cal.App.4th 1076, 1086 [same]), cases involving claims for inverse condemnation (*Lyles*, *supra*, 153 Cal.App.4th at p. 286 [using "sufficiently appreciable" damage test]; *Mehl v. People ex rel. Dept. of Pub. Wks.* (1975) 13 Cal.3d 710, 714-717 [same]), or cases involving claims against builders when a latent construction defect did not immediately manifest itself (*Oakes v. McCarthy Co.* (1968) 267 Cal.App.2d 231, 255-256; *Liptak v. Diane Apartments, Inc.* (1980) 109 Cal.App.3d 762, 769). Even if we apply the "sufficiently appreciable" test here, it is satisfied because, as we explain above, the alleged water intrusion problem manifested itself several times and would have caused a reasonable person to suspect a problem with the building (and hence its developer).

Third, LTL contends that a ruling in its favor is dictated by *Allen*, *supra*, 137 Cal.App.3d 216, *Angeles Chemical Co. v. Spencer & Jones* (1996) 44 Cal.App.4th 112 (*Angeles Chemical Co.*), *Leaf*, *supra*, 104 Cal.App.3d 398, and *Creekridge Townhome Owners*, *supra*, 177 Cal.App.4th 251. These cases are inapposite. In *Allen*, the court ruled that a 1977 lawsuit for a latent construction defect in a 1957-built home was timely, but that was because it was not until 1975 that the defect manifested itself in a way indicating a latent defect attributable to the home's builder. (*Allen*, at pp. 222-223.) In *Angeles Chemical Co.*, the court ruled that a 1993 lawsuit for contamination due to a 1981 construction accident severing an underground pipe at a chemical plant was timely under the discovery rule, but that was because it was not until 1986 that the

plaintiff discovered any soil contamination and not until 1990 that it learned of the broken pipe. (*Angeles Chemical Co.*, at pp. 117-119.) In *Leaf*, the court ruled that a 1977 lawsuit for a latent construction defect in a 1963-built duplex was timely, but that was because it was not until 1976 that the plaintiffs discovered that the problems with their foundation were due to the builder's failure to compact soil rather than natural causes such as water absorption. (*Leaf*, at pp. 402-404, 409.) And in *Creekridge Townhome Owners*, as noted above, the court ruled that a 2004 lawsuit for a latent construction defect in a 1997-built condominium complex was timely, but that was because it was not until 2003 that the plaintiff learned that there was a systemic problem with the roof. (*Creekridge Townhome owners*, at pp. 253-259.) Unlike the plaintiffs in *Allen*, *Angeles Chemical Co.*, *Leaf*, and *Creekridge Townhome Owners*, LTL had ample reason to suspect by March 9, 2011, that there was a systemic defect with the building and that the developer was the entity responsible for failing to remedy that defect.

Lastly, LTL argues that it amended its original complaint to add the developer as a "Doe" defendant in the SAC pursuant to Code of Civil Procedure section 474, and that this amendment consequently relates back to the February 8, 2013 filing of its original complaint and renders its lawsuit against the developer timely. Because a wrongdoer's *identity* is not an element of a cause of action (*Fox*, *supra*, 35 Cal.4th at p. 813; *Bernson*, *supra*, 7 Cal.4th at p. 932), the statute of limitations can begin to run before the plaintiff knows precisely whom to sue; Code of Civil Procedure section 474 permits a plaintiff to name a "Doe" defendant as a placeholder and then add defendants as they are identified through discovery. (*McClatchy v. Coblentz, Patch, Duffy & Bass, LLP* (2016) 247 Cal.App.4th 368, 371-372.) If the plaintiff was "ignorant of the name of the defendant" (Code Civ. Proc., § 474), then the amended complaint will relate back—and deemed to be filed—as of the date of the originally filed complaint naming that defendant as a "Doe." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 398.) A plaintiff is "ignorant" of a defendant within the meaning of the statute "'until he has [actual] knowledge of sufficient facts to cause a reasonable person to believe liability is probable'" against that defendant due to that defendant's "connection with the case or

13

with [the plaintiff's] injuries." (*General Motors Corp. v. Superior Court* (1996) 48 Cal.App.4th 580, 589-590, 594-595; *Fuller v. Tucker* (2000) 84 Cal.App.4th 1163, 1172; *McOwen v. Grossman* (2007) 153 Cal.App.4th 937, 942-943) A plaintiff is not "ignorant" of a defendant just because he does not "'know or believe that [he] had a cause of action based on those facts'" (*McClatchy*, at p. 372) or because he does not know "each and every detail concerning [a defendant's] involvement" (*General Motors*, at pp. 594-595).

In this case, LTL—through Lee—knew that the developer was the entity responsible for the building, and also knew of the multiple leaks indicating that the problem was systemic and widespread (rather than unrelated, isolated incidents involving negligent condo owners). These are sufficient facts "to cause a reasonable person to believe that liability is probable" against the developer. Indeed, Lee's frank admission that he did not pursue the developer at first because he did not think the problem was "severe enough" indicates his awareness of potential liability. On appeal, LTL suggests that it did not fully comprehend the scope of the problem until it received a report detailing a 2005 water leak affecting the fifth through second floors when a fifth-floor tenant used a fire sprinkler as a hanger hook. But LTL received that report *from the developer after naming the developer in its SAC*. Thus, the report was certainly not necessary to alert LTL to the developer's potential liability. Indeed, LTL proffers no additional information it acquired regarding the developer's involvement between the time it filed its original complaint and the time it named the developer in its SAC. This confirms that LTL actually knew of sufficient facts that it could have named the developer in its original complaint; consequently, LTL cannot avail itself of the relation-back doctrine under Code of Civil Procedure section 474.

We accordingly agree with the trial court that LTL's claim against the developer is time barred.

### B.    *Contractual Releases*

Although Civil Code section 1668 provides that "contracts which have for their object . . . to exempt anyone from responsibility for his own . . . violation of law, whether

willful or negligent, are against public policy," California courts have held that contracts "releas[ing] . . . negligence claims are not against public policy" and are accordingly valid. (*Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354, 360; cf. *City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754-756 [releases of gross negligence in recreational activities are against public policy].) We interpret contractual releases like any other contract (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524), giving the greatest weight to the contract's plain language (*Plaza Home Mortgage, Inc. v. North American Title Co., Inc.* (2010) 184 Cal.App.4th 130, 135-136; Civ. Code, § 1638) and "avoid[ing] interpretations that render any portion superfluous, void or inexplicable" (*Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1507). Where, as here, no parole evidence has been introduced, our review is de novo. (*Khavarian Enterprises, Inc. v. Commline, Inc.* (2013) 216 Cal.App.4th 310, 318.)

### 1. *Release in Purchase Agreement*

Sections 24.3 and 26 of the Purchase Agreement work in tandem: Section 24.3 spells out that "the Property" was being sold in an "as is condition," that Lee was relying solely on his own inspection of "the Property," and that he was releasing any future claims arising from his inspection and other documentation provided by the developer. Section 26 echoes that Lee was "rely[ing] solely upon [his] own knowledge of the Property based on [his] investigation . . . and . . . inspection of the Property" and repeats that Lee was releasing the developer from "any and all claims . . . arising from or related to the Property."

It is well settled that "as is" clauses and their related releases are valid. (*Loughrin v. Superior Court* (1993) 15 Cal.App.4th 1188, 1192. "As is" clauses "put[] potential buyers on notice that the seller makes no warranties about the quality or condition of the thing sold." (*Shapiro v. Hu* (1986) 188 Cal.App.3d 324, 333.) "[G]enerally speaking," they "mean[] that the buyer takes the property in the condition visible to or observable by him." (*Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 742 (*Lingsch*).) "As is" clauses do not release a party from liability for (1) defects that were not observable (*ibid.*; *Katz v. Department of Real Estate* (1979) 96 Cal.App.3d 895, 901 (*Katz*); cf. *Driver v. Melone*

15

(1970) 11 Cal.App.3d 746, 750 ["as is" clause covers wiring defects "obvious to anyone who inspected the building"]), or (2) material defects that the seller knows about but does not disclose (*Loughrin*, at p. 1195; *Lingsch*, at pp. 740-741; *Wilson v. Century 21 Great Western Realty* (1993) 15 Cal.App.4th 298, 304-305; *Reed v. King* (1983) 145 Cal.App.3d 261, 265-266).

The "as is" and release clauses contained in the Purchase Agreement were both tied to Lee's right to inspect "the Property." The plain language of the Purchase Agreement defined "the Property" as being solely the commercial space within the building. Accordingly, Lee had the right to inspect only the commercial space, and had no opportunity to observe—and could not release any claims regarding—any defects found within the residential space in the building. Thus, under the case law noted above, the plain language of the "as is" clause and accompanying release do not as a matter of law preclude LTL's claim based on a defect in the *residential* portion of the building.

The trial court's contrary conclusion rested on its observations that the commercial and residential space were all part of the same building and that the MBA granted the commercial owner (Lee) the right to inspect portions of the residential space. In our view, neither observation dictates a finding, as a matter of law, that Lee had the right to inspect the piping located within the residential area when, as we must infer from the absence of any evidence on this point, that piping served only the condo owners. It is undoubtedly true that the commercial and residential spaces are in the same building, but the MBA painstakingly defined the rights that the commercial owner and residential association had to access one another's space; the MBA's careful delineation of access rights refutes the notion that Lee's inspection rights, the "as is" clause, and the release reached the residential space in the building just because it was part of the same building. Assuming (as the trial court did) that we may look to the access rights of the commercial owner in the MBA to define Lee's inspection rights under the Purchase Agreement, it is unclear whether the MBA empowers the commercial owner to inspect the piping located within and serving only the residential space of the building. The maintenance duties shared by the commercial owner and residential association under the MBA reach only

16

those improvements "jointly used" by both; it would not reach piping used only to serve the condominiums, which are instead entrusted to the residential association to maintain. The commercial owner's own maintenance duties also do not reach piping located within and serving only the condominiums. It is also unclear whether the commercial owner has the independent right to access the piping: One section of the MBA purports to grant a nonexclusive easement to each owner across the other's space in the building to "maintain" utility systems, while another section seems to contemplate that one owner must notify and consult with the other before repairing "structural elements" located in the other's space. Thus, in our view, there are material disputes as to whether the MBA is the proper document to look to regarding Lee's inspection rights and whether the MBA conferred upon Lee the right to inspect the piping that was eventually defective. These disputes preclude a grant of summary judgment.

The developer makes three further arguments. First, it argues that we need not be concerned with Lee's inspection rights under the Purchase Agreement because the release in section 26 reaches "any and all claims . . . arising from *or related to* the Property." (Italics added.) The phrase "related to," the developer reasons, has been construed broadly (*Allstate Ins. Co. v. Loo* (1996) 46 Cal.App.4th 1794, 1799-1800; *Elijahjuan v. Superior Court* (2012) 210 Cal.App.4th 15, 23-24), and reaches the allegedly defective piping in this case because it is "related to" the Property, even if it is not located *in* the Property Lee had a right to inspect. We reject this construction. *Allstate* and *Elijahjuan* interpreted the phrase "related to" contained in an attorney's fees clause and arbitration clause, respectively; they did not involve contractual releases or the law interpreting them. This is important because the developer's expansive reading of the "related to" clause in the Purchase Agreement's release would negate liability for defects that Lee never had the opportunity to inspect or observe, thereby violating the legal rule that "as is" clauses and their respective releases only release claims regarding observable defects (*Lingsch*, *supra*, 213 Cal.App.2d at p. 742; *Katz*, *supra*, 96 Cal.App.3d at p. 901). Indeed, section 24.3 itself acknowledged that it reached only as far as—but not beyond— "the maximum extent permitted by law." For the same reason, we reject the developer's

17

related assertion that Lee's "approv[al]," in the amendment to the Purchase Agreement, "of the Property *and all matters in connection with the Property*" means that the release reaches defects he could not inspect or observe. (Italics added.)

Second, the developer contends that it would be absurd to construe the "as is" and release clauses as reaching only observable matters because it would impose greater liability upon the developer for latent defects than would exist without those clauses. To be sure, we must avoid construing a contract in a manner that leads to absurd results. (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 953-954 (*Edwards*).) But our reading of the Purchase Agreement's "as is" and release clauses does no such thing. The developer's argument conflates the concepts of liability and release: The fact that a contractual release does not bar a plaintiff's alleged claim does not mean that the claim has merit; it just means that it is not knocked out by the release.

Third, at oral argument, the developer argued that any dispute over Lee's contractual right under the MBA to inspect the residential space does not involve a material fact because Lee never tried to exercise that right by asking to inspect that space. Had Lee asked, however, it is not clear whether his request would have been granted because the MBA's meaning on this point is, as noted above, subject to conflicting interpretations. Absent a right to inspect, as explained above, an "as is" clause is invalid. Thus, the fact that Lee did not ask to inspect the residential space does not obviate the underlying material dispute as to the validity of the "as is" and release clauses.

We accordingly conclude that the Purchase Agreement does not as a matter of law bar LTL's negligence claim.

### 2. *Release in 2010 Settlement Agreement*

The plain language of the "mutual release" provision in the 2010 Settlement Agreement bars LTL's negligence claim against the developer. That provision has two clauses: (1) the first part "release[s]" the developer from "any and all actions . . . arising out of the [2009] Action"; and (2) the second part "release[s] . . . any claims regarding . . . wrongful conduct in connection with the sale of the commercial unit . . ., any alleged breaches of the MBA . . ., and any other claims relating to either Party's

ownership, use or occupancy of their respective property at the Little Tokyo Lofts project based on actions taken prior to the date of this Settlement Agreement." LTL's claim that the developer "failed to exercise reasonable care" in "fail[ing] to properly design, prepare, investigate, supervise, construct and inspect the Little Tokyo Lofts property" to prevent the water intrusions is a claim for "wrongful conduct in connection with the [2007] sale" and is also a "claim[] relating to [LTL's] ownership, use or occupancy of [its] respective property . . . based on actions taken prior to [the 2010 Settlement Agreement]." In other words, LTL's claim falls squarely within the plain language of the second clause of the release provision.

LTL levels five challenges to this conclusion. First, it argues that the meaning of this contractual language cannot be decided on summary judgment at all because the scope of a waiver is a question of fact. (*Leaf*, *supra*, 104 Cal.App.3d at p. 411.) It often is, but not where, as here, there is no extrinsic evidence and the undisputed plain language of the contract delineating that waiver has only one reasonable interpretation as a matter of law. (*Skrbina*, *supra*, 45 Cal.App.4th at p. 1366.)

Second, LTL contends that the first clause of the release is limited to the claims "arising out of the [2009] Action"; that the second clause starts with the language that "[t]his release also *includes*"; that the second clause is therefore a subset of the first clause; and that the second clause does not reach LTL's negligence claim because it has nothing to do with the commercial tenant dispute underlying the 2009 litigation. LTL asserts that its reading of the release clause is reinforced by the fact that the Settlement Agreement, in its "Recitals," notes that it is the product of the 2009 Action. We disagree with this reading. The plain language of the release provision's second clause is expansive, reaching "any claims . . . in connection with the sale of the commercial unit . . . as well as any alleged breaches of the MBA and . . . and any other claims relating to either Party's ownership, use or occupancy of their respective property at the Little Tokyo Lofts project . . . ." This language goes far beyond the 2009 dispute over harassment of one of LTL's commercial tenants and on its face rebuts LTL's argument. The expansiveness of the second clause is buttressed by the fact that the release goes on

19

to except from its reach any of the parties' existing or future rights (as opposed to past rights) under the Purchase Agreement or the MBA. There would be no reason to carve out these rights unless the release itself covered any and all claims under those contracts in the first place. (Cf. *City of Cerritos v. State of California* (2015) 239 Cal.App.4th 1020, 1055 [rejecting interpretation that "essentially renders the exception . . . meaningless"]; *Soco West, Inc. v. California Environmental Protection Agency* (2013) 213 Cal.App.4th 1511, 1518-1519 [same].) The language in the Recital section is also of no moment; what prompted the 2010 Settlement Agreement does not define its scope, particularly in the face of clear language to the contrary.

Third, LTL posits that reading the second clause broadly renders the two exceptions to that clause meaningless. LTL has it backwards. As we explain above, it is only by construing the second clause broadly that its two exceptions have any meaning at all.

Fourth, LTL suggests that its negligence claim is not a "claim" for "wrongful conduct" (the second clause's first subclause) or a claim arising under the MBA (the second clause's second subclause), and that we must therefore construe the "any other claims relating to either Party's ownership, use or occupancy" narrowly because all three subclauses are part of a list and must therefore be construed similarly. We need not parse this argument in detail because its premise is wrong: Negligence *is* "wrongful conduct" (e.g., *Angeles Chemical Co.*, *supra*, 44 Cal.App.4th at p. 119 [noting that "[a] negligence claim involving damage to real property" is "wrongful conduct"]; *Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 189 [discussing "wrongful conduct forming the foundation for plaintiffs' negligence claim"]; see generally *Stephen K. v. Roni L.* (1980) 105 Cal.App.3d 640, 642 ["the word 'tort[]' means a civil wrong other than a breach of contract"]), so LTL's claim falls under the first subclause, and construing the third subclause consistently with the first subclause does LTL no good.

Lastly, and for the first time on rebuttal during oral argument, LTL argues that the third subclause does not apply because it releases claims "relating to either [p]arty's ownership, use or occupancy of [its] respective property." Because the water leak

springs from somewhere in the residential space, LTL reasons, it does not apply to LTL as the owner of the commercial space. Not only has LTL forfeited this argument by waiting until oral argument to raise it, this argument lacks merit because the water leaks—no matter where their original source—"relat[e] to [LTL's] ownership, use or occupancy of [its] respective property" because those leaks are allegedly interfering with the commercial tenants' use and occupancy of the commercial space.

The 2010 Settlement Agreement bars LTL's negligence claim against the developer.

## II. The Developer's Appeal of the Attorney's Fees Ruling

California follows the so-called "American rule" when it comes to attorney's fees: Parties in civil litigation bear their own unless a statute or contract provides otherwise. (Code Civ. Proc., § 1021; *Eden Township Healthcare Dist. v. Eden Medical Center* (2013) 220 Cal.App.4th 418, 425 (*Eden Township*).) If the parties to a contract agree to shift liability for attorney's fees, our task is to give effect to their contract. (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 577.) Although we generally review a trial court's denial of contract-based attorney's fees for an abuse of discretion (*Walker v. Ticor Title Co. of California* (2012) 204 Cal.App.4th 363, 370), we independently review its interpretation of that contract where, as here, there is no extrinsic evidence to consider (*Windsor Pacific LLC v. Samwood Co., Inc.* (2013) 213 Cal.App.4th 263, 273 (*Windsor Pacific*)).

As we have concluded above, the developer is entitled to summary judgment in part because of the release provision contained in the 2010 Settlement Agreement. The attorney's fees clause in that contract provides as follows: "Should any of the Parties [1] initiate, commence or prosecute [2] any action or proceeding [3a] to enforce any of the terms of this Settlement Agreement, [3b] to seek relief for a violation of any of the terms of this Settlement Agreement, or [3c] to protect their respective interests in any matter under this Settlement Agreement, [4] the prevailing party shall recover all reasonable costs and expenses, including attorneys' fees and experts' fees, expended or incurred in connection therewith."

21

Because the developer is the "prevailing party" in LTL's lawsuit, the pertinent question becomes: Does the developer's successful invocation of the 2010 Settlement Agreement's release as a defense to plaintiff's negligence claim entitle it to attorney's fees under the plain language of the above-quoted provision? We conclude it does not because the developer cannot satisfy the first requirement under the provision—it did not "initiate, commence or prosecute" any action or proceeding. In *Exxess Electronixx v. Heger Realty Corp.* (1998) 64 Cal.App.4th 698, 711-712 (*Exxess Electronixx*), the court held that a civil defendant was not entitled to contractual attorney's fees under a provision applying when "'any Party . . . *brings an action or proceeding* to enforce the terms'" of that contract when that defendant raised the contract's "as is" clause as a defense to the plaintiff's tort claims; the court reasoned that it could not "equate raising a 'defense' with bringing an 'action' or 'proceeding.'" *Gil v. Mansano* (2004) 121 Cal.App.4th 739, 742-745 (*Gil*) came to the same conclusion when a defendant prevailed after raising a contractual release as a defense to the plaintiff's tort action, and sought contractual attorney's fees based on a clause that applied when an "'action is brought to enforce the terms of th[e] [Release].'"

The developer raises four objections to this analysis. First, it argues that *Windsor Pacific*, *supra*, 213 Cal.App.4th 263 and *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2014) 231 Cal.App.4th 805, review granted March 18, 2015, S223536, rejected *Exxess Electronixx*'s and *Gil*'s holdings. As the developer acknowledges, our Supreme Court granted review on and depublished *Mountain Air*, so the Court of Appeal's decision is of no precedential consequence. For its part, *Windsor Pacific* involved a broader contractual attorney's fees provision and on that basis explicitly distinguished *Exxess Electronixx* and *Gil*. (*Windsor Pacific*, at p. 276.) In *Windsor Pacific*, the plaintiff sued the defendant for a prescriptive easement and the defendant successfully raised, as a defense, an earlier contractual easement between the parties. (*Id.* at p. 274.) The attorney's fees provision in that contract provided, in pertinent part, that the prevailing party was entitled to fees "'[i]n any action or proceeding to enforce *or interpret* the provisions of'" that contract. (*Id.* at pp. 267-268, italics added) The

22

*Windsor Pacific* court reasoned that the defendant's assertion of the contract converted the case into "'an[] action . . . to . . . interpret'" that contract. (*Id.* at pp. 274, 276.) The court also specifically distinguished the attorney's fees provisions in *Exxess Electronixx* and *Gil* because the provisions in those cases only applied when an action was "'brought'" to enforce the contract and the clause in *Windsor Pacific* had no such requirement. (*Id.* at p. 276.) By limiting attorney's fees to instances in which a party "initiate[s], commence[s] or prosecute[s]" an action or proceeding (rather than merely "bringing" an action or proceeding), the attorney's fees clause in the 2010 Settlement Agreement evinces an even stronger intent that the clause be limited to instances in which the Settlement Agreement is being used affirmatively, not defensively.

Notwithstanding these textual distinctions in the releases at issue, the developer insists that *Windsor Pacific* controls. It argues that the trial court in this case was called upon to "interpret" the 2010 Settlement Agreement. This is true, but irrelevant because the 2010 Settlement Agreement's attorney's fees provision, unlike the one in *Windsor Pacific*, did not reach "'action[s] . . . to . . . interpret'" the contract. The developer also notes that *Windsor Pacific* went on to register its disagreement with *Exxess Electronixx* and *Gil* as to whether a "defense" qualifies as an "action or proceeding" (*Windsor Pacific*, *supra*, 213 Cal.App.4th. at p. 276). But this disagreement does not undermine the *Windsor Pacific* court's reliance on the difference in the provisions' language (and, mostly notably, the absence of language confining attorney's fees awards to the party "bringing" that "action or proceeding"). Consequently, we need not weigh in on this debate. What is more, *Windsor Pacific'*s position on this issue is a departure from the law in effect at the time the 2010 Settlement Agreement was negotiated and signed. (E.g., *Salawy v. Ocean Towers Housing Corp.* (2004) 121 Cal.App.4th 664, 672 ["[a]n 'action to enforce' does not refer to . . . a defense" because it "is not 'prosecuted' against another"]; *DiPirro v. Bondo Corp.* (2007) 153 Cal.App.4th 150, 185 [same].) Because "parties are presumed to have had existing law in mind when they executed their agreement," we are loath to use "subsequent changes in the law which impose greater burdens or responsibilities upon the parties" to "modify [their agreement] without their

23

consent" and thereby "promote uncertainty in commercial transactions." (*Swenson v. File* (1970) 3 Cal.3d 389, 394.)

Second, the developer contends that denying it attorney's fees leads to an absurd result—namely, that it would not be entitled to attorney's fees when raising the release as a defense but would be so entitled if it had chosen to file a cross-claim for declaratory relief based on the release. Although, as noted above, we must construe contracts to avoid absurd results (*Edwards*, *supra*, 44 Cal.4th at pp. 953-954), the developer's argument mixes apples and oranges. The developer would be eligible for attorney's fees if it had cross-claimed for declaratory relief by virtue of Civil Code section 1717, which, as we discuss more fully below, provides that attorney's fees are to be awarded to the "prevailing party" "[i]n any action on a contract," including an action for declaratory relief on that contract (*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 241 (*Douglas E. Barnart*)). Civil Code section 1717 is an entirely separate basis for awarding attorney's fees than a contract providing for them. (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 617-618 (*Santisas*).) As a consequence, the developer's potential entitlement to attorney's fees under Civil Code section 1717 under a hypothetical litigation strategy it never employed is not a basis for construing the contract any differently.

Third, the developer asserts that interpreting the attorney's fees provision in the 2010 Settlement Agreement to apply when the release provision is asserted as a defense would provide an additional disincentive against initiating litigation barred by the release. This is true, but the release itself already provides for the dismissal of barred litigation. Nothing in the 2010 Settlement Agreement indicates the parties' intent to tack on additional penalties, such as liability for attorney's fees, as a means of providing the maximum deterrence for litigation that might be barred by the release.

Lastly, the developer asserts that it is entitled to attorney's fees under Civil Code section 1717. Under that section, if a contract "specifically provides that attorney's fees and costs" "incurred to enforce that contract" in litigation shall be awarded to the "prevailing party," a court is to award attorney's fees to the "party prevailing on the

24

contract" "[i]n any action on [that] contract" "whether he or she is the party specified in the contract or not." (Civ. Code, § 1717, subd. (a).)

The developer is not entitled to attorney's fees under Civil Code section 1717 for three reasons. To begin, LTL's action against the developer is based solely on the tort of negligence, and it is well settled that a negligence claim is not an "action on a contract" within the meaning of section 1717. (*Santisas*, *supra*, 17 Cal.4th at p. 615 ["section 1717 applies only to actions that contain at least one contract claim"]; *Windsor Pacific*, *supra*, 213 Cal.App.4th at p. 273 [section 1717 "is inapplicable . . . to noncontract claims"]; *Douglas E. Barnhart*, *supra*, 211 Cal.App.4th at p. 241 ["the phrase 'action on a contract' as used in section 1717 includes an action seeking declaratory and injunctive relief to enforce a" contract].) Further, the cases the developer cites in support of its position all involve an award of fees to a defendant who prevailed against a plaintiff who had brought a lawsuit seeking to validate or invalidate a contract. (See *Santisas*, at pp. 603, 615 [plaintiff sued for breach of contract and various torts; "section 1717 applies only to attorney fees incurred to litigate the contract claims"]; *Eden Township*, *supra*, 220 Cal.App.4th at pp. 420-421, 426 [plaintiff sued for declaratory relief to invalidate contract; "an action to avoid enforcement of a contract is an action 'on a contract' within the meaning of section 1717"]; *Douglas E. Barnhart*, at pp. 237-238 [plaintiff sued for breach of contract]; *Turner v. Schultz* (2009) 175 Cal.App.4th 974, 976, 979-980 [plaintiff sued for declaratory relief to invalidate an arbitration agreement].) Finally, the developer's argument is fundamentally at odds with the purpose of Civil Code section 1717. That section is designed to create a mutuality of entitlement to attorney fees because it "permits [a] party's recovery of attorneys fees whenever the opposing parties would have been entitled to attorney fees under the contract had they prevailed." (*Santisas*, at p. 611.) In this case, LTL is not entitled to attorney's fees under Civil Code section 1717 because its negligence action is, by definition, not "an[] action on a contract"; were we to construe section 1717 to award the developer attorney's fees, we would be construing section 1717 in a manner that would award fees unilaterally, not bilaterally. That is a result precisely contrary to section 1717's purpose.

25

**DISPOSITION**

The judgment and attorney's fees order are affirmed.  Each party to bear its own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
HOFFSTADT

We concur:

_____, Acting P. J.
ASHMANN-GERST

_____, J.
CHAVEZ